IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Ft. Myers Division
Case No. 2:08-cv-00534-JES-SPC

CHARLES SCHWAB & CO., INC.

     Plaintiff,

vs.

LANCE MCMURRY,

     Defendant.

_____/

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION

Plaintiff, CHARLES SCHWAB & CO., INC. ("Schwab")'s Motion for Preliminary Injunction should be denied for reasons which we will state and argue concisely, without pages of string citations and repetitive discussions of obvious legal principles.

The fact of first importance in perceiving the inequity of what Schwab is trying to do here, is that Schwab did not pay Defendant, LANCE MCMURRY ("McMurry"), the large sum of past due wages it owed him while he was employed there. In effect, Schwab breached its contract with McMurry, but still wants to enforce it against him.

Thus, this case can be rightly viewed as one prong in a pincer movement by Schwab: wrongfully withholding McMurry's wages while pinning him in place with a contract provision to stop him from earning wages at another company. Schwab's claim is not only grossly inequitable, but is also legally deficient since Schwab cannot insist on performance of a contract it has already breached.

### SCHWAB CANNOT ENFORCE A CONTRACT IT HAS ALREADY BREACHED

### <u>Schwab's Promise</u>

Each of the four iterations of the Schwab Contract attached to the Complaint[1] explicitly states that McMurry's promises, including the non-solicitation covenants upon which Schwab's entire case depend, are conditioned upon payment of the compensation Schwab promised to McMurry: "*In consideration for...the compensation paid and to be paid to me*...I am willing to enter into this Confidentiality, Nonsolicitation, and Assignment Agreement..." (*emphasis added*)

It is an elementary principal of contracts, expressed many times in cases like this one, that a contracting party who has not kept its own promise cannot seek to enforce the other party's promise. *Northern Trust Investments, N.A. v. Domino*, 896 So. 2d 880 (Fla. 4th DCA 2005); *Bradley v. Health Coalition, Inc.*, 687 So. 2d 329 (Fla. 3d DCA 1997); *Benemerito & Flores, M.D.s, P.A. v. Roche*, 751 So. 2d 91 (Fla. 4th DCA 1999); *Troup v. Heacock*, 367 So. 2d 691 (Fla. 1st DCA 1979). In *Bradley*, the court stated, "If the employer wrongfully refuses to pay the employee his compensation, the employee is relieved of any further obligation under the contract and the employer cannot obtain an injunction." 687 So. 2d at 333. Therefore, if McMurry can prove that Schwab failed to keep its promise to pay him, this Court should decline to enforce the Schwab Contract against McMurry.

---

[1]Exhibits A-D of Schwab's Complaint

## **Schwab's Breach**

Schwab has admitted that for a period of approximately a year before McMurry resigned, Schwab diverted thousands of dollars owed to McMurry, to another financial advisor, without revealing this to McMurry. When this diversion was exposed, Schwab refused to promptly pay McMurry the compensation it had owed him for many months. The proof of this is not only in the two affidavits filed by McMurry[2], but also in the deposition testimony of Schwab's manager, Joseph Lacagnina[3] ("Lacagnina"):

Q.    When Lance McMurry resigned from Schwab, Schwab owed him money, didn't it?

A.    Yes.

\*        \*        \*

Q.    How long had it been owed to him?

A.    Probably for about that period, 12 months.

\*        \*        \*

Q.    At the time he resigned there was money that already should have been paid to him months before that; is that correct?

A.    Correct.

---

[2]See McMurry Affidavit filed on 7/28/08 as Exhibit A to McMurry's Motion for Expedited Discovery; and McMurry's Second Affidavit, attached hereto as Exhibit A.

[3]Lacagnina's Deposition is attached as Exhibit B, hereto. Customer names have been redacted.

Q.    Instead of agreeing to pay it right away, you're making him wait 9 to 12 months to get it?

A.    That's accurate...

*See Lacagnina deposition, pages 6-8.*

Schwab will not dispute that it was only after McMurry's undersigned counsel raised the issue with Schwab's counsel, *after Schwab had commenced this action,* that McMurry was finally paid[4]. Thus, Lacagnina stated, "Is it safe to say Schwab owed Lance money and didn't give it to him until after he resigned?", he replied, "Yes." *See Lacagnina deposition, page 16.*

Two checks were sent to McMurry, representing gross compensation of $27,957.65, and net pay of $20,352.44, after withholding. The checks are attached to McMurry's Second Affidavit, and are dated July 31, 2008 and October 22, 2008, both clearly long after the filing of this case. [McMurry was never provided with an accounting, so he does not even know whether payment in full has occurred, or how Schwab calculated the two payments made four months apart.]

Thus, Schwab sued McMurry to enforce the Schwab Contract, without paying McMurry one cent of the wages it had indisputably owed to him for an extended period. Only when Schwab was advised that its failure to pay wages would be asserted as a defense

---

[4]See e-mail correspondence between counsel attached as Exhibit C.

in this lawsuit, did Schwab finally pay its debts to McMurry. It is unknown whether full payment to McMurry has been completed.

## The Rightful Consequence of Schwab's Breach

When the cases cited above are applied to the undisputed proof of Schwab's breach of its obligation to pay McMurry's wages – the consideration Schwab promised in exchange for McMurry's promise not to compete – only one fair conclusion is possible: Schwab has forfeited its right to enforce the Schwab Contract against McMurry. This is bedrock contract law, and to allow Schwab to evade this principle would render its failure to pay McMurry's wages absolutely inconsequential and meaningless.

Schwab asks this Court to set the precedent that Schwab can wrongfully deprive an employee of his wages, and then also limit that employee's ability to earn wages at another company by enforcing the non-solicitation agreement through an injunction. We ask that the Court turn down Schwab's inequitable request.

Although Schwab's material breach of its obligation to pay McMurry's wages is enough to mandate denial of Schwab's motion, it is not the only reason. The language Schwab used in its Contract provides another compelling rationale for denial. This is because that language does not prohibit McMurry from announcing to his customers that he had changed firms, and the McMurry announcements are the only supposedly wrongful contacts that Schwab can prove McMurry had with Schwab customers.

## THE SCHWAB CONTRACT DOES NOT PROHIBIT ANNOUNCEMENTS

McMurry freely admits that he announced his resignation and new affiliation to his Schwab customers. The difficulty for Schwab is that the sequence of contracts it required McMurry to sign show a progression of changes that belie its position that McMurry was forbidden to make the announcements.

### The Evolution of the Schwab Contract

There are four versions of the Schwab Contract, each attached in its entirety to Schwab's Complaint as Exhibits A-D. We ask that the Court resist assuming that they are all alike, and instead read the key provisions of each one, a tedious but essential exercise to understand what is and is not prohibited. To save space, we have attached to this Memorandum as Exhibit D only the key pages of the four versions.

**The June 14, 2004 Contract.** The key clause in Exhibit A, signed June 14, 2004, is paragraph 9, which pertains to post-employment restrictions. It states that the former employee may not, "solicit or attempt to solicit" Schwab customers, though discussions about business at the employee's new company are permitted if the customer initiated the discussions. The relevance of what Schwab has offered as proof of a breach – the announcements – rests entirely upon interpretation of the phrase, "solicit or attempt to solicit." Schwab asks the Court to apply an aggressive interpretation to this phrase,

construing it to mean a mere announcement can be deemed a solicitation. Schwab has even cited caselaw that holds that an announcement may be viewed as a "solicitation".

But Schwab has not cited any case that pertains to the circumstances in this case. Here, Exhibit A does not stand alone, susceptible to the expansive interpretation upon which Schwab's case depends. Rather, Exhibit A represents only the first step in an informative evolution of language and intent, which continues through Exhibits B, C, and D.

**The March 29, 2006 Contract and its New Clause.** The relevant clause in Exhibit B, signed March 29, 2006, is paragraph 10. Like Exhibit A, it proscribes soliciting. But it adds something new:

> "If Schwab assigns me to service specific retail client account relationships (the "Specified Accounts"), I will not, for a period of one year following the termination of my employment with Schwab, initiate any contact for any purpose with any of the Specified Accounts (including notifying them of my new or subsequent place(s) of employment)."

Thus, we can see two key differences from Exhibit A: first, a new kind of account is identified, the "Specified Account"; and second, a higher restriction is placed on the employee in regard to the Specified Account - that the employee may not even contact a Specified Account after resignation.

Clearly Exhibit B represented a change or departure from Exhibit A, in the form of a new prohibition against announcing new employment to Specified Accounts. *This change would only have been necessary if Exhibit A did not already prohibit that which the addition*

*to Exhibit B prohibits.* For Schwab to argue to the contrary is tantamount to Schwab proclaiming that its own Specified Account provision is meaningless and superfluous.

Thus, this additional language in Exhibit B cancels out the interpretation Schwab wants for the phrase "solicit or attempt to solicit" which we saw in Exhibit A. If that phrase precluded mere announcements, there would have been no reason to include in Exhibit B a new provision that specifically precludes announcements. The applicability of the new provision to only a limited sub-set of Schwab accounts called the "Specified Accounts", reinforces the logic of this conclusion. This is so because if the restriction were uniform across all accounts, then there would be no reason to establish two categories of accounts.

Stated another way, Exhibit B shows that Schwab knew how to explicitly prohibit announcements if it desired to impose such a restriction. Thus, it could easily have explicitly extended the no-announcement language to all accounts, instead of just to the Specified Accounts. And it could have done so in Exhibit A. It did not.

**The April 16, 2007 and May 2, 2008 Contracts.** Interestingly, the Specified Accounts clause is present in Exhibit C, signed April 16, 2007, in paragraph 9. But paragraph 3 in Exhibit D, signed May 2, 2008, removes the Specified Account clause, and instead prohibits an attempt to "directly or indirectly solicit or induce."

The removal of the Specified Accounts clause adds further weight to McMurry's view. After all, a reasonable assumption is that something previously added would not have

been removed if the original addition was meaningless and if the removal was equally meaningless. Therefore the removal of the "no-announcement" clause evinced an intent to make still another change to the Contract.

Thus, when all viewed together, the Exhibits show first an absence, then an inclusion of something new, and then a removal and return to the original state. The Court should give meaning to this by concluding what is obvious: Schwab had not prohibited enough in Exhibit A, so it used Exhibit B to establish a hierarchy of accounts with differing obligations. Later, Schwab decided to collapse the hierarchy and return to the status quo ante.

Thus, as of McMurry's resignation, the most recent version of the Contract in effect, Exhibit D signed on May 2, 2008, did not contain the Specified Accounts clause prohibiting announcements. Considering the history of the Contract, it was entirely reasonable for McMurry to conclude that announcements were not prohibited.

Schwab's only witness, Lacagnina, comes closer to supporting our view of the Schwab Contract, than Schwab's view, when he repeatedly states he does not know whether a mere announcement violates the Schwab Contract:

Q.     How many clients of Schwab did Lance improperly solicit?

A.     I'm not sure.

Q.     Can you give some kind of estimate, you're suing him, I wonder if you have any idea how many improper solicitations there have been?

A.    What do you mean by improper?

Q.    By solicitations that you regard as having violated his contract with Schwab?

A.    I couldn't put a number on it.

Q.    Is it less than five?

A.    No, I'd say probably more than five.

Q.    Is it more than ten?

A.    Probably.

Q.    Is it more than fifteen?

A.    I don't know. If I have to put a number on it I'd say every client he contacted in my opinion.

Q.    So he has improperly solicited every single client he contacted, is that your testimony?

A.    Once again I'll say I don't know because I don't know what was said specifically.

                    *        *        *

Q.    So in your view, you've testified at length about those clauses in your affidavit I see, in your view if Lance called up a client and said hi, just letting you know I resigned so you can't reach me at Schwab anymore, was that a solicitation?

A.    Not necessarily.

\*       \*       \*

Q.    I'm not there anymore but someone else can take over your account at Schwab, that would not count as solicitation, do you think?

A.    I couldn't say for sure. I'd have to know more about the conversation.

Q.    Well, what do you need to know about the conversation, exactly what was said?

A.    It would depend on the conversation, yeah.

Q.    What have you done to learn all about Lance's conversations with customers so you could make the assessment whether he violated his contract?

A.    I haven't done anything like that.

*See Lacagnina deposition, pages 43-46.*

This last admission, that he has done nothing to investigate whether McMurry violated the Contract, is particularly telling because Schwab taped numerous conversations it had with McMurry's customers after he resigned[5]. *See Lacagnina deposition, pages 17-18, 35.* Lacagnina or someone else at Schwab could have listened to these to determine whether McMurry solicited customers. *But not even one of these conversations has been offered into evidence by Schwab.* This enormous omission leads us to a larger observation about Schwab's case: there is no reliable evidence of a single overt solicitation by McMurry of a Schwab customer.

---

[5]Schwab's counsel has stated in correspondence that approximately 150 calls were taped.

### SCHWAB CANNOT PROVE OVERT SOLICITATIONS

Without treating announcements as solicitations, Schwab is left with virtually nothing, as its proof of overt solicitations by McMurry is almost non-existent. Indeed, the only proof comes, not from a customer, but in the form a few terse references in Lacagnina's Affidavit (filed by Schwab with the Complaint) and his deposition.

### The "Proof" of Overt Solicitation

In paragraphs 16 and 17 of Lacagnina's Affidavit, he states in sweeping categorical fashion that "Schwab customers have been reporting that they are receiving telephone calls from McMurry soliciting them to move their business to BOA." He adds that one customer said McMurry "wants them to switch over" and that the son of another customer said McMurry was being "predatory" towards his widow mother. In his deposition, Lacagnina could identify only one single customer who McMurry solicited, "Martha", who also happens to be the customer whose son said McMurry was being "predatory". *See Lacagnina deposition, page 31-32.*

The Martha story is absolutely bogus, as is shown by the Declaration of Martha, attached to McMurry's Second Affidavit. This Declaration was signed on December 15, 2008. It decisively rebuts the allegation of solicitation and predatory behavior.

Since Schwab cannot identify any other customer who McMurry solicited, we must conclude that it has no other credible proof. Recall that Schwab taped many, many of its

calls to customers. Surely it could find one conversation that supported its allegation, if one existed. Apparently, none do. And that is the end of Schwab's proof of overt solicitation. By no means should an injunction be based on such flimsy proof.

### SCHWAB HAS ELECTED A REMEDY INCONSISTENT WITH INJUNCTIVE RELIEF

### Injunction Plus Liquidated Damages: Double Relief

The May 2, 2008 version of the Schwab Contract[6] states, in Paragraph 11:

> *If I solicit clients* or employees in violation of Paragraph 3, *and/or use or disclose Confidential Information relating to clients and/or their accounts* in violation of Paragraph 1, *I understand Schwab will suffer damages* that may be too difficult to quantify at the time of the violation, *including, but not limited to: costs associated with the investigating, monitoring, or remedying the misuse of Confidential Information; costs associated with maintaining, restoring or repairing Schwab's relationship with current and prospective clients; revenue lost from client assets diverted or transferred;* costs associated with replacing employees, including recruiting, hiring and training replacement employees, and lost productivity. Therefore, if I violate Paragraph 3, and/or Paragraph 1 relating to clients and/or their accounts , *I agree to pay Schwab the following liquidated damages: (a) four percent (4%) of any client assets diverted from Schwab for any client who was solicited and/or whose Confidential Information was used or disclosed;* and/or, (b) seventy-five percent (75%) of the most recent full year's total annual compensation paid by Schwab to each employee solicited or induced to leave his or her employment. I agree that *these formulas represent reasonable estimates of the compensatory damages that Schwab will incur as a result of violations* of Paragraph 3 and/or Paragraph 1 relating to clients and/or their accounts, and are not a penalty. These liquidated damages are in addition to any other non-compensatory relief that Schwab may be entitled to, including but not limited to injunctive relief and/or punitive damages.

---

[6]Exhibit D to the Complaint

Thus, the Schwab Contract specifically defines the 4% as a "reasonable estimate of the compensatory damages." Since no quantitative qualifier was included in this phrase by Schwab, the drafter of the Contract, the Court should assume that the reasonable estimate is of *all* – as opposed to *part* – of the damage Schwab might suffer by McMurry's breach of the Contract. From this reasonable conclusion, it follows that Schwab and McMurry have agreed between them exactly how Schwab will be fully compensated by a breach.

Since Schwab has commenced a FINRA action to obtain the liquidated damages referenced in the Contract, while simultaneously pursuing injunctive relief in this action, Schwab is seeking a duplicate recovery:

> "Regardless of the form of covenant which the parties have adopted, the invocation of the equitable remedy against a breach is inconsistent with the assertion of a right which the parties have agreed should accrue as compensation for all of the loss that may follow from the breach...A judgment that compels the defendant to perform his contract and at the same time permits the plaintiffs to retain the price of performance or which awards them compensation for non-performance would give them more than they are entitled to."

*Wirth & Hamid Fair Booking, Inc. v. Wirth,* 192 N.E. 297, 302 (NY Ct App. 1934). The *presence* of the liquidated damages clause in the Schwab Contract does not create an election which precludes injunctive relief. *Karpiniski v. Ingrasci,* 320 N.Y.S. 2d 1 (Ct App. 1971). But the clause is not merely "present" in the Schwab Contract; it has been explicitly activated by Schwab's claim on it in the companion FINRA action.

Thus, Schwab has not merely pled alternative theories of relief. Schwab has asked this Court to award one form of relief in advance of the other, which it also seeks in another forum. Should Schwab obtain both injunctive relief and damages, it would be getting more than it is entitled to – an injunction *plus* damages to compensate for the same wrong.

Further, by pursuing these remedies in separate forums, Schwab avoids having to make an election, and gives itself the proverbial two bites at the same apple: if the first type of relief – the injunction – is not obtained, the second type of relief – liquidated damages – is still available. It would be inequitable to award Schwab two de novo tries to obtain relief for the same alleged wrong.

### McMurry Possesses No Confidential Documents or Information of Schwab

In its December 12, 2008 Supplemental Memorandum, Schwab claims that McMurry made himself a list of Schwab clients in his own handwriting, used that list to obtain contact information from the internet, and then contacted the clients to announce his resignation and new employment. McMurry does not dispute these facts. What McMurry disputes is the conclusion Schwab has reached, that McMurry misappropriated confidential information and that an injunction should be entered as a result.

Whether names in McMurry's memory are confidential information of Schwab (as if there were a way to deactivate McMurry's memory), and whether he misused that information by basing his internet search on it is no longer relevant for injunctive purposes.

As Schwab points out, the list McMurry created has been shredded. There is not one iota of proof that McMurry possesses or ever after his resignation possessed, any other Schwab confidential information. *See McMurry's Second Affidavit.* Therefore, an injunction is pointless; there is nothing to return.

It is noteworthy that McMurry left his employment at Schwab on June 11, 2008. This case was not filed until July 3, 2008, and Schwab did not seek a TRO, or do much else to urge this Court to act expeditiously. Clearly no emergency was presented, and this is suggestive that whatever McMurry did was not causing irreparable harm. Stated conversely, if McMurry was acting to harm Schwab in ways that could never be fixed, Schwab would have acted immediately, and would have sought a TRO.

Thus, if the making and use of the handwritten list was wrong to begin with, then Schwab has its damages claim. An injunction now is useless.

## CONCLUSION

Taken together, the reasons we have given the Court for denying Schwab's request are compelling. At the least, we have shown that Schwab cannot prove that it is likely to prevail on the merits of this case when it is tried before FINRA. Consequently, we ask that the Court deny Schwab's request for a preliminary injunction.

December 15, 2008                Respectfully submitted,

Peter J. Aldrich (Fla Bar No. 0340324)
PETER J. ALDRICH, P.A.
E-mail: peter.aldrich@aldrichlaw.net
100 Village Square Crossing, Suite 201
P.O. Box 32699
Palm Beach Gardens, FL 33420
Phone (561) 775-7797
Fax (561) 775-1075
Attorney for Defendant McMurry

BY: _____
PETER J. ALDRICH
Florida Bar No. 0340324

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed a true and correct copy of the foregoing with the Clerk of the Court by using the CM/ECF system, and that a true and correct copy of the foregoing has been furnished by U.S. Mail delivery to **Cathy M. Stutin, Esq.,** Fisher & Phillips LLP, 450 East Las Olas Blvd., Suite 800, Fort Lauderdale, Florida, 33301, and to **Susan M. Guerette, Esq.**, Fisher & Phillips LLP, Radnor Financial Center, Suite 650, 201 King of Prussia Road, Radnor, PA 19087 this _15_ day of December, 2008.

BY: _____
PETER J. ALDRICH
Florida Bar No. 0340324

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION
Case No. 2:08-cv-00534-JES-SPC

CHARLES SCHWAB & CO., INC.

      Plaintiff,

vs.

LANCE MCMURRY,

      Defendant.

_____/

## MCMURRY'S SECOND AFFIDAVIT
## IN OPPOSITION TO
## SCHWAB'S REQUEST FOR AN INJUNCTION

STATE OF FLORIDA
COUNTY OF COLLIER

      PERSONALLY APPEARED, before me, the undersigned officer duly authorized to administer oaths and take acknowledgments, Lance McMurry, who, after being by me first duly cautioned and sworn, upon his oath, deposes and says:

      1.    I am the defendant in this matter. The facts set forth herein are based on my personal knowledge. I make this affidavit in opposition to the request of Charles Schwab & Co., Inc. ("Schwab") for injunctive relief against me.

      2.    During my employment with Schwab, I discovered that Schwab had diverted

Exhibit A

certain sales credits due me, to another financial consultant. Well before my resignation from Schwab on June 11, 2008, I raised this with Schwab, through my manager, Joe Lacagnina.

3. While I was still employed by Schwab, Lacagnina admitted to me that I was correct, and that Schwab had diverted thousands of dollars of my compensation to someone else. I demanded that the sums be paid to me. Lacagnina stated that he had communicated with other officials of Schwab and had been told that Schwab would not promptly pay the diverted compensation to me. Rather, he said that Schwab planned to pay my wages at some indeterminate point in the future, on unspecified terms which, as much as I could glean from Lacagnina, would have been extremely disadvantageous and unfair to me, and therefore patently in violation of my contract with Schwab. Shortly thereafter, I resigned from Schwab.

4. Some time later, I received two checks from Schwab, representing gross wages in the amount of $27,957.65. Copies are attached to this affidavit. I do not know how this sum was calculated.

5. Contrary to the insinuations contained in Lacagnina's Affidavit, I have not taken any confidential documents or documents containing confidential client information, or any computerized confidential records from Schwab. On or about June 6, 2008, while at home and working entirely from memory and without reference to any Schwab records, I handwrote a list of most of my Schwab customers. I used the list to look up contact information on the internet for those customers. I printed the internet information and destroyed my handwritten list. I used the internet printouts to help me contact certain customers in order to announce my employment change. My

attorney has produced the internet printouts to Schwab.

6.     I have no Schwab documents or records in my possession. Pursuant to the Court's Order, I delivered my personal computer to Schwab's computer expert for analysis, to prove that I did not possess any computerized information trade secret information belonging to Schwab.

7.     I have contact information for some of the clients I serviced at Schwab, who are now my clients at Banc of America Investments (BOA), stored in my personal cell phone. To the best of my ability, I searched my cell phone for any information on Schwab customers who are not my BOA clients, and I have a phone number for only one.     This number was saved automatically by my phone.  I have not done any business with this person since I resigned from Schwab, and I am not intending to solicit or contact this person. My counsel has informed Schwab of who this person is.

8.     Contrary to the allegations contained in the Complaint filed against me by Schwab, I have not solicited any clients serviced by me at Schwab to transfer their accounts to BOA, either prior to or since my resignation. Given the gyrating markets we have seen this year, I judged that irreparable injury could have occurred to my clients if they did not realize that I had left Schwab and was no longer giving my attention to their portfolios.  I also felt that it was professionally proper for me to inform the clients of my resignation.  I did not want them to learn from Schwab that I had simply "disappeared".  I do not interpret my contract with Schwab to preclude me from

contacting my clients solely to advise them of my change in employment and to provide to them my new contact information. I have done this with some, but not all, of my clients. Of course, I hoped that some of my customers would inquire about transferring to BOA and many did. My Schwab contract does not prohibit me from discussing prospective business at BOA with clients who initiate such discussions with me.

9.      On December 12, 2008, I spoke with my former Schwab customer "Martha." I did so because Joe Lacagnina has alleged in his deposition that I solicited and/or acted in a "predatory" manner towards Martha after my resignation from Schwab. I asked Martha whether she would verify that I had not solicited her or acted improperly in any fashion. She agreed, and signed a Declaration for me to file with the Court. It is attached to this Affidavit.

        FURTHER AFFIANT SAYS NOT.

                                        Lance McMurry

STATE OF FLORIDA

COUNTY OF COLLIER

        The foregoing instrument was acknowledged before me this ___15___ day of December , 2008, by Lance McMurry, who is [✓] personally known to me or [✓] has produced the following identification ___FL DL___, which is current or has been issued within the past five years and bears a serial or other identifying number, and who did not take an oath.


Notary Public

Printed Notary Name   Carroll Baker

My Commission Expires:



CARROLL BAKER
Notary Public, State of Florida
Commission# DD385453
My comm. expires Jan. 12, 2009

F:\Clients\Banc of America\McMurry\Pleading\Second Affidavit of McMurry.wpd

4/5

WARNING: THE FACE OF THIS CHECK HAS A BLUE BACKGROUND AND THE BACK HAS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

# charles SCHWAB

101 Montgomery Street San Francisco California 94104

11-35/1210

BANK OF AMERICA
1850 Gateway Blvd
Concord CA 94520

Check No.
7494352

Date: 07/31/2008          Pay Amount: $14,132.08 ****

Pay      ****FOURTEEN THOUSAND ONE HUNDRED THIRTY-TWO AND 08/100 DOLLARS****

To The
Order Of

LANCE MCMURRY
1952 Isla De Palma Circle
Naples, FL 34119

*Joseph R Montott*

CHK 10101-08

⑈7494352⑈ ⑇121000358⑇ 123335796⑈

---

Charles Schwab & Co., Inc.
101 Montgomery Street
San Francisco CA 94104
415/636-7000

| Pay Group: | EXS-Exempt, Salaried | Check #: | 7494352 |
| Pay Begin Date: | 07/16/2008 | Check Date: | 07/31/2008 |
| Pay End Date: | 07/31/2008 | | |

| Lance McMurry | | Employee ID: 07096 | | TAX DATA: | Federal | FL State |
| 1952 Isla De Palma Circle | | Department: 589-Naples Fl | | Marital Status: | Married | n/a |
| Naples FL 34119 | | Location: Signature Boca Raton West | | | | |
| | | Job Title: VP - Financial Consultant | | Allowances: | 2 | 0 |
| | | Pay Rate: $40,000.00 Annual | | Addl. Pct.: | | |
| | | | | Addl. Amt.: | | |

## HOURS AND EARNINGS / TAXES

| Description | Rate | Current Hours | Earnings | YTD Hours | YTD Earnings | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Practice Pay | | | 20,043.60 | | 98,491.87 | Fed Withholdng | 5,620.89 | 23,933.28 |
| Float Pay | | 16.00 | | | 307.69 | Fed MED/EE | 290.63 | 1,815.54 |
| Stock Option Exercise | | | | | 7,065.33 | Fed OASDI/EE | 0.00 | 6,324.00 |
| Dual employ cross charge earns | | | | | 916.63 | | | |
| EE Life Credit | | | | | 229.92 | | | |
| Pay Out Vacation | | | | 200.00 | 3,846.15 | | | |
| Regular Pay | | | | 824.40 | 15,878.28 | | | |
| Unvested Restricted Share Div. | | | | | 431.80 | | | |
| T&E Reimbursement | | | | | 276.75 | | | |
| Vacation | | | | 48.00 | 923.08 | | | |

## BEFORE-TAX DEDUCTIONS / AFTER-TAX DEDUCTIONS / EMPLOYER PAID BENEFITS

| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Medical Plan Deduction | | 1,728.00 | Stock Option Exercise Offset | | 4,758.50 | EE Basic Life Insurance* | | 195.48 |
| Dental Plan Deduction | | 240.00 | Group Legal Plan – Met Law | | 95.76 | | | |
| Vision Insurance | | 24.00 | | | | | | |
| EE Basic Life Insurance | | 229.92 | | | | | | |
| Disability Option 1 | | 396.11 | | | | | | |
| 401(k) Savings Plan | | 12,038.44 | | | | | | |
| Health Care Expense Account | | 458.36 | | | | | | |

## TOTAL GROSS / FED TAXABLE GROSS / TOTAL TAXES / TOTAL DEDUCTIONS / NET PAY

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 20,043.60 | 20,043.60 | 5,911.52 | 0.00 | 14,132.08 |
| YTD | 128,367.50 | 113,171.40 | 32,092.82 | 19,969.09 | 76,305.59 |

| NET PAY DISTRIBUTION | | |
|---|---|---|
| Check # 7494352 | | 14,132.08 |
| Total: | | 14,132.08 |

MESSAGE: For assistance, please contact HR Direct on the Schwab.

**Charles Schwab & Co., Inc.**
101 Montgomery Street
San Francisco CA 94104                415/636-7000

| Pay Group: | EXS-Exempt, Salaried |
| Pay Begin Date: | 10/16/2008 |
| Pay End Date: | 10/30/2008 |

| Check #: | 7499613 |
| Check Date: | 10/22/2008 |

Lance McMurry
1952 Isla De Palma Circle
Naples FL 34119

| Employee ID: | 07096 |
| Department: | 589-Naples Fl |
| Location: | Signature Boca Raton West |
| Job Title: | VP - Financial Consultant |
| Pay Rate: | $40,000.00 Annual |

| TAX DATA: | Federal | FL State |
| Marital Status: | Married | n/a |
| Allowances: | 2 | 0 |
| Addl. Pct.: | | |
| Addl. Amt.: | | |

## HOURS AND EARNINGS

| | | Current | | YTD | | TAXES | | |
|---|---|---|---|---|---|---|---|---|
| Description | Rate | Hours | Earnings | Hours | Earnings | Description | Current | YTD |
| Additional Pay | | | 7,914.05 | | 7,914.05 | Fed Withholding | 1,578.93 | 25,532.21 |
| Float Pay | | | | 16.00 | 307.69 | Fed MED/EE | 114.76 | 1,930.30 |
| Stock Option Exercise | | | | | 7,065.33 | Fed OASDI/EE | 0.00 | 6,324.00 |
| Dual employ cross charge earns | | | | | 916.63 | | | |
| EE Life Credit | | | | | 229.92 | | | |
| Pay Out Vacation | | | | 200.00 | 3,846.15 | | | |
| Regular Pay | | | | 824.40 | 15,878.28 | | | |
| Unvested Restricted Share Div. | | | | | 431.80 | | | |
| T&R Reimbursement | | | | | 276.75 | | | |
| Vacation | | | | 48.00 | 923.08 | | | |
| Practice Pay | | | | | 98,491.87 | | | |

## BEFORE-TAX DEDUCTIONS / AFTER-TAX DEDUCTIONS / EMPLOYER PAID BENEFITS

| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Medical Plan Deduction | | 1,728.00 | Stock Option Exercise Offset | | 4,758.50 | EE Basic Life Insurance* | | 195.48 |
| Dental Plan Deduction | | 240.00 | Group Legal Plan - Met Law | | 95.76 | | | |
| Vision Insurance | | 24.00 | | | | | | |
| EE Basic Life Insurance | | 229.92 | | | | | | |
| Disability Option 1 | | 396.11 | | | | | | |
| 401(k) Savings Plan | | 12,038.44 | | | | | | |
| Health Care Expense Account | | 458.36 | | | | | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 7,914.05 | 7,914.05 | 1,693.69 | 0.00 | 6,220.36 |
| YTD: | 136,281.55 | 121,085.45 | 33,786.51 | 19,969.09 | 82,525.95 |

| NET PAY DISTRIBUTION | |
|---|---|
| Check # 7499613 | 6,220.36 |
| Total: | 6,220.36 |

MESSAGE: For assistance, email Schwab HRDirect at HRDirect@schwab.com

---

_charles_ SCHWAB

101 Montgomery Street  San Francisco  California 94104

11-35/1210

BANK OF AMERICA
1850 Gateway Blvd
Concord CA 94520

Check No.
7499613

Date:  10/22/2008                    Pay Amount:  $6,220.36 *****

Pay          ****SIX THOUSAND TWO HUNDRED TWENTY AND 36/100 DOLLARS****

To The
Order Of
          LANCE MCMURRY
          1952 Isla De Palma Circle
          Naples, FL 34119

_Joseph R. Martott_

CHK 10101-03

⑈7499613⑈ ⑈121000358⑈ 123335796⑈

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Ft. Myers Division
Case No. 2:08-cv-00534-JES-SPC

CHARLES SCHWAB & CO., INC.

      Plaintiff,

vs.

LANCE MCMURRY,

      Defendant.

_____/

### DECLARATION OF MARTHA

1.    I reside in Ft. Myers, Florida. I make this Declaration for submission by Lance McMurry in the above-captioned proceeding, to assist the Court.

2.    I have known Lance McMurry for several years, as my financial advisor at Schwab. Recently, Mr. McMurry left Schwab and is now working at Banc of America Investments (BOA). I am still a client of Schwab.

3.    I understand that Schwab is suing Mr. McMurry, contending that he solicited me and other Schwab clients to transfer our accounts to BOA. In my case, I can state that Mr. McMurry absolutely did not solicit me to transfer my account to BOA.

4.    When Mr. McMurry resigned from Schwab, I expected to be told of his resignation, as I worked closely with him on my financial affairs. I was not lured, solicited, coerced, or persuaded by Mr. McMurry to transfer my account. Mr. McMurry has never behaved in any inappropriate, predatory, or unseemly way toward me.

Martha

1
2  IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
3  DISTRICT OF FLORIDA FORT MYERS DIVISION
4          CASE NO: 2:08-cv-534-fTm-29spc
5
6
7
8  CHARLES SCHWAB & CO., INC.
9          Plaintiff,
10 vs.
11 LANCE MCMURRY
12         Defendant.
13 _____
14
15         DEPOSITION OF THE WITNESS
           JOSEPH LACAGNINA
16         TAKEN BY THE Defendant
           ON November 6, 2008
17
18
19
20
21
22
23
24
25

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFF
4  FISHER & PHILLIPS, LLP
   201 King of Prussia Road, Suite 650
5  Radnor, PA 19087
6  BY: SUSAN GUERETTE
7
8  ON BEHALF OF THE DEFENDANT
9
   PETER J. ALDRICH, P.A.
10 100 Village Square Crossing, Suite 201
   P.O. Box 32699
11 Palm Beach Gardens, FL 33420
12 BY: PETER J. ALDRICH
13
14 ON BEHALF OF BANC OF AMERICA
15 WEISMAN, BRODIE, STARR & MARGOLIES
   1301 North Federal Hwy
16 Lake Worth, FL 33460
17 BY: LAURA STARR
18 ALSO PRESENT: MAI KLAASEN, PLAINTIFF
19
20
21
22
23
24
25

1
2              I N D E X
3
4  WITNESS        EXAMINATION        PAGE
5
6  JOSEPH LACAGNINA                    4
7
8      Direct by Mr. Aldrich        4
9      Cross by Mr. Brodie          47
10     Cross by Ms. Starr           61
11
12
13     QUESTIONS MARKED FOR RULING
14
15 PAGE NO.          LINE NO.
16
17 52                   23
18
19
20
21
22
23
24
25

1      Deposition of JOSEPH LACAGNINA, a witness
2  herein, taken on behalf of the Plaintiff herein, for
3  the purpose of discovery and for use as evidence in
4  the above-entitled cause, before JULIE ANDOLPHO,
5  Court Reporter and Notary Public in and for the
6  State of Florida at Large, at 1551 Forum Place, West
7  Palm Beach, State of Florida, on November 6, 2008,
8  commencing at or about 2:40 p.m.
9
10 Whereupon:
11         JOSEPH LACAGNINA,
12 a witness herein being of lawful age, and being
13 first duly sworn in the above cause, testified on
14 his/her oath as follows:
15
16
17 DIRECT BY MR. ALDRICH:
18     Q    Please state your name and business
19 address.
20     A    Joseph Charles Lacagnina, 300 5th Avenue
21 South, Naples, Florida.
22     Q    Where do you work?
23     A    Charles Schwab.
24     Q    How long you worked there?
25     A    Since 2000.

1 (Pages 1 to 4)

EXHIBIT B

1    Q    What's your job?
2    A    Branch manager for Naples, Fort Myers and
3  Bonita Springs.
4    Q    What are you responsibilities?
5    A    I basically manage the office for 15
6  representatives including financial consultants and
7  service specialists.
8    Q    How long have you had that job?
9    A    Two years.
10   Q    What did you do before that?
11   A    A financial consultant for Schwab.
12   Q    For how long?
13   A    Started in 2000 up until 2006, so for six
14 years.
15   Q    Where?
16   A    Fort Myers and then Naples.
17   Q    What were you -- where were you working
18 before Schwab?
19   A    On Wall Street.  I was a derivatives
20 broker for a firm called Lasher Marshall (phonetic).
21   Q    How long?
22   A    Close to ten years.
23   Q    Why did you leave that firm?
24   A    Changes, different industry, I got
25 licensed and decided I wanted to move towards the

1  retail side, it was more of a institutional type of
2  job.
3    Q    You have any items reported on a CRD?
4    A    The only one I would have now would be an
5  issue with the yield plus at Schwab.
6    Q    How about -- when you say the only one you
7  have now, were there things that used to be there
8  that were taken off?
9    A    Not that I'm aware of, no.
10   Q    There would be one customer complaint?
11   A    Yes.
12   Q    Where did you work before you were
13 involved in derivatives?
14   A    In school, college.
15   Q    Where about?
16   A    Ryder College, Lawrenceville, New Jersey.
17   Q    Get a degree?
18   A    Yes.
19   Q    In what?
20   A    Finance.
21   Q    What are your registrations?
22   A    Series 7, 63, Series 9, 10, and 55, NASDAQ
23 trading.
24   Q    When Lance McMurry resigned from Schwab,
25 Schwab owed him money, didn't it?

1    A    Yes.
2    Q    Why hadn't you paid the funds before that?
3    A    We weren't aware of the problem with the
4  compensation at the time.  We weren't aware he
5  wasn't getting paid.
6    Q    In other words, you didn't know until he
7  had resigned that you owed him money?
8    A    No, we knew before that.
9    Q    Why didn't you pay him?
10   A    The way our compensation is set up and the
11 way the adjustment is set up he was going to be paid
12 out over the following, probably 9 months to 12, in
13 compensation that was owed to him.
14   Q    How long had it been owed to him?
15   A    Probably for about that period, 12 months.
16   Q    Nine to 12 months?
17   A    In some cases it was 12 months for a
18 particular customer depending when he actually
19 closed the business with Schwab Private Client, a
20 period of 12 months the longest, maybe three months
21 the shortest.
22   Q    At the time he resigned there was money
23 that already should have been paid to him months
24 before that; is that correct?
25   A    Correct.

1    Q    Instead of agreeing to pay it right away,
2  you're making him wait 9 to 12 months to get it?
3    A    That's accurate.  The reason for that,
4  basically, from my understanding form the people in
5  Incentives was because the consultant was paid in
6  error where it should have been paid to Lance so
7  we'd have to debit the money owed to Lance from that
8  particular consultant.  To do that if they did it in
9  a lump sum my understanding is that consultant
10 wouldn't be paid for two months entirely.
11   Q    Why didn't Schwab just wait to get the
12 money it erroneously paid to the other consultant
13 and give Lance the money?
14   A    I don't understand the question.
15   Q    Why were you making Lance wait because of
16 a problem that was caused by Schwab and another
17 consultant?
18   A    I was not making him wait, that's the way,
19 like I said before, our adjustment or incentives are
20 set up and are instructed to be paid.  He would have
21 been paid every dime that was owed but it would have
22 probably taken 9 to 12 months to do that.
23   Q    How did you discover this problem?
24   A    I came across -- one of my other FC's made
25 a referral to another consultant in the office and

1 realized he wasn't getting paid on it. Lance and I
2 had conversations in the past about a couple of
3 clients Craig referred to him and wasn't sure if it
4 was tracking or not, when we'd go back and say it
5 was tracking, I'd say did you get it squared away
6 and he'd say, yeah, I think so, I think Craig's got
7 it squared away, issued the paperwork and everything
8 is done. When I went and checked on the other
9 consultant's compensation I realized there was an
10 error and went back to Lance and went through
11 certain accounts that I knew that Craig had referred
12 to him and did a self audit on that to see if, in
13 fact, he was getting paid, when I discovered he
14 wasn't I went to Lance and compiled a list together
15 and sent it to Incentives and said we need to make
16 an adjustment on this for repayment.
17　　Q　If I'm understanding, you discovered the
18 problem not Lance and then went to Lance?
19　　A　Yes.
20　　Q　And it wasn't that Lance became concerned
21 and went to you, you initiated the situation?
22　　A　Lance did come to me at times without the
23 specifics of am I getting paid on this particular
24 client or not. When we went back eventually and
25 started auditing I said to him it looks like you're

1 not getting paid, the client might have been Jim
2 　　　, the one I recognized, and went through
3 several other clients and discovered he wasn't
4 getting paid.
5　　Q　What's Craig's last name?
6　　A　Stevens.
7　　Q　Have you talked to Craig Stevens about
8 whether he knew he was getting overpaid during the 9
9 to 12-month period?
10　　A　He did not know he was being overpaid, no.
11　　Q　How much money you talking about?
12　　A　I think our estimations are --
13　　　MS. GUERETTE: -- I don't want you to
14 guess.
15　　A　I'm not sure.
16　　　MS. GUERETTE: If you know.
17　　A　I would say 9 to $10,000.
18　　Q　So Craig Stevens told you that he didn't
19 realize he was being overpaid by $10,000?
20　　A　Craig Stevens was not paid $10,000 in one
21 lump sum. He was paid $10,000 over a period of one
22 year. I would assume he didn't realize that.
23　　Q　What documentation exists of your
24 discovery of the problem and your raising it to
25 Schwab?

1　　A　There was a spreadsheet I submitted to
2 Incentives to have him compensated for the
3 adjustment.
4　　Q　What form did you --
5　　A　-- it was an Excel spreadsheet.
6　　Q　I posed my question badly. Let me start
7 over.
8　　　MS. GUERETTE: Give him a minute.
9　　Q　When you sent it to Incentives, the
10 spreadsheets you made, did you send it with a piece
11 of correspondence such as an email, for example?
12　　A　I sent it in the form of an email.
13　　Q　There should be an email from you to the
14 Incentives Department to which is attached the
15 spreadsheet you described?
16　　A　Yes.
17　　Q　Did the Incentives Department send you
18 something back?
19　　A　We did -- they did calculations in the
20 spreadsheet and then the adjustments, pursuant
21 adjustments, were entered after the spreadsheets to
22 eventually have Lance compensated for the clients.
23　　Q　Is the spreadsheets in the Incentives
24 Department that did all this in San Francisco?
25　　A　I believe so. The person I worked with,

1 I'm not exactly sure, the person I worked with was
2 in Phoenix.
3　　Q　What's the person's name?
4　　A　Michael Eliason, E-L-I-A-S-O-N.
5　　Q　How did you learn from Michael Eliason the
6 Incentives Department was going to make the
7 adjustments and pay Lance?
8　　A　I asked -- actually, Lance had asked me,
9 when I learned of the error, how it was going to be
10 paid and I went to Incentives and said, Mike, how
11 will they work this because one rep has to be
12 debited and one credited, and they said we go back
13 and do it over the course of the months that it
14 would be paid and that's probably -- that was
15 probably a week before Lance resigned and Lance had
16 asked me at that point is there any way to get it
17 paid out in a lump sum.
18　　Q　And your answer was?
19　　A　My answer was no.
20　　Q　So he resigned and did you then, on your
21 own, initiate the payment to him?
22　　A　I don't understand the question.
23　　Q　Has the money been paid?
24　　A　Yes, to my knowledge it has.
25　　Q　How do you know that?

1  A  I received an email from my boss saying it
2  was paid.
3  Q  When was that?
4  A  A couple of weeks ago, three weeks ago.
5  Q  Who is your boss?
6  A  Laura Jean Roetzel.
7  Q  There will be an email from Laura Jean to
8  you about the issue?
9  A  There was an email from me after an email
10  from someone in Human Resources, I guess, that she
11  requested that payment be made. To my knowledge
12  it's been paid.
13  Q  Suffice to say there's a series of emails,
14  you to Incentives, Incentives to you, Laura Jean,
15  Human Resources, Laura Jean to you, a series of
16  people involved with a sequence of emails about this
17  problem?
18  A  No. No. There was probably one or two or
19  three emails between me and Incentives. There was a
20  phone call from me to Incentives and I'm not sure
21  how many emails were sent between Laura Jean and
22  Human Resources, I wasn't privy to the emails.
23  Q  Certainly though at least one email
24  between you and Laura Jean on the subject?
25  A  That was a phone conversation between

1  Laura Jean and myself about the particular
2  compensation that was owed to Lance. We never
3  exchanged an email until she finally sent an email
4  to me saying it was going to be paid or had been
5  paid.
6  Q  That's what I meant, there was an email?
7  A  Yeah, that was the one email.
8  Q  Have you done anything to try to gather
9  these emails for production in this case to us?
10  A  I haven't. No one's requested it from me
11  so I haven't asked for it.
12  Q  How many payments do you think were made
13  to Lance after his resignation?
14  A  I'm not sure. To my knowledge I think
15  once an employee resigns they stop payments. I
16  can't really say for sure.
17  Q  So --
18  MS. GUERETTE: -- I want to caution you,
19  Joe, not to speculate. He only wants to know
20  what you absolutely know.
21  Q  Were you aware I made a demand on behalf
22  of Lance that he be paid?
23  A  No.
24  Q  Are you aware he's been sent more than one
25  check by Schwab?

1  A  No.
2  Q  Are you aware that he was sent a check as
3  recently as around October 27th or so?
4  A  No.
5  Q  Are you aware that the approximate
6  magnitude of the these funds that were paid is in
7  the neighborhood of $20,000?
8  A  No.
9  Q  Do you agree with me that these funds that
10  were paid after Lance resigned clearly should have
11  been paid to him before he resigned?
12  MS. GUERETTE: I want to object to the
13  extent it calls for a legal conclusion.
14  Q  You can answer.
15  A  My answer to that is if the error hadn't
16  been made he would have been paid.
17  Q  To put it in different terms, Schwab owed
18  him the money and didn't give it to him until some
19  time after he resigned, as simple as that.
20  MS. GUERETTE: I want to object to the
21  extent it calls for a legal conclusion in terms
22  of what you're asking him.
23  MR. BRODIE: How does it call for a legal
24  conclusion?
25  MS. GUERETTE: In terms of whether it was

1  owed to him has a legal connotation.
2  Q  Any doubt in your mind it was owed to
3  Lance?
4  A  No.
5  Q  Is it safe to say Schwab owed Lance money
6  and didn't give it to him until after he resigned?
7  A  Yes.
8  Q  And the decline, declining by Schwab of
9  Lance's request that it be paid to him in a lump
10  sum, that was a decision of the Incentives
11  Department?
12  A  I would think so. It wasn't my decision.
13  Q  Did you personally support Lance's request
14  that he be paid in a lump sum?
15  A  I probably -- if it was possibly I
16  probably would have said yes but then he resigned so
17  after that it was a moot point.
18  Q  Before he resigned there was a
19  conversation when he said to you can I be paid in a
20  lump sum and you said no.
21  A  That's the answer I got back from
22  Incentives.
23  Q  That's a decision made from someone
24  somewhere else?
25  A  Someone higher up than me.

1    Q   Do you have any idea why they wouldn't
2  give it to him?
3    A   No.
4    Q   So it's clear, are there any written
5  communications about the request to be paid in a
6  lump sum and the denial of that request by
7  written -- I'm including emails, of course?
8    A   No.
9    Q   Tell me about all the taping you've been
10  doing of conversations with Lance's customers. Who
11  have you been taping?
12       MS. GUERETTE: I'm going to object to your
13    statement he's been taping them.
14    A   Yeah.
15    Q   All the taping Schwab has been doing of
16  conversations with Lance's customers, tell me who
17  has been -- who at Schwab has been speaking to
18  customers in a taped conversation?
19    A   The calls that are taped are out of the
20  call centers, so Indianapolis, for example, where
21  Lance's clients were serviced out of, Orlando, any
22  800 numbers where calls come in were typically
23  taped.
24    Q   And have you reviewed any of those?
25    A   No.

1    Q   Have you attempted to have those
2  retrieved?
3    A   They have been retrieved.
4    Q   Where are they?
5    A   I would imagine they're with the teams in
6  Indianapolis.
7    Q   How do you know they've been retrieved?
8       MS. GUERETTE: I'm not sure -- I think
9    there might be a mis-communication what you
10    mean by retrieved.
11    Q   Tell us what you mean.
12    A   Retrieved meaning if a client had a
13  conversation with Joy that worked with Lance, that
14  call is recorded, it could be pulled if we needed to
15  hear the call, that's what I mean by retrieved.
16       MS. GUERETTE: Have they been retrieved?
17    A   They've been recorded, I don't know if
18  they were retrieved.
19    Q   Have you done anything to check to see?
20    A   No.
21    Q   Why not? Don't you want to know the exact
22  conversations between Schwab and the customers
23  Schwab claims Lance interfered with?
24    A   I've heard from people that have talked to
25  some of the clients so I haven't listened to the

1  calls, no.
2    Q   Who have you heard from?
3    A   Jaime, Joy.
4    Q   Last names, please.
5    A   Joy Cadle, Jaime Constantina.
6    Q   These people you said, Joy and Jaime,
7  those are Schwab employees that spoke with Schwab
8  clients?
9    A   These are employees that worked with Lance
10  in Schwab Private Client, they were his team.
11    Q   How was it they came to be making calls to
12  Schwab customers?
13    A   When Lance resigned we reached out to all
14  of the existing Schwab clients that Lance serviced
15  while he was at Schwab.
16    Q   Was that your idea to reach out?
17    A   My idea as well as -- that's pretty much
18  standard protocol when a consultant leaves a branch
19  we have assigned practices so we reach out as
20  quickly as possible.
21    Q   Did LJ tell you to do it?
22    A   I knew to do it.
23    Q   Did you speak to her about that?
24    A   We might have had a conversation, I don't
25  recall.

1    Q   When Lance resigned, did you speak to her
2  about that?
3    A   That Lance resigned, yes.
4    Q   What did she say to you about that?
5    A   I can't remember exactly what we said.
6  She was surprised and then basically said I guess
7  you got a lot of work to do the next couple of days
8  and I was off doing it.
9    Q   Have you done anything to assemble
10  documents from your branch and where you work in
11  connection with Lance's situation?
12    A   I'm not quite sure I understand the
13  question.
14    Q   Have you gathered any documents that you
15  intend to use to support your case?
16    A   Not that I can recall, no.
17    Q   Did any of the people in -- forget about
18  the call centers -- any of the people in your
19  branches call any of Lance's clients?
20    A   Yes.
21    Q   Who are they?
22    A   Probably, to name names I'll say Craig
23  Stevens was one, John O'Brien, and keep in mind all
24  the names I'll list were consultants that had
25  referred business to Lance, so there was Barbara

1  Hassit, Mike McCourt, Matt Straton, and, of course,
2  I called a few as well.
3      Q   Okay.  Your mention of Craig Stevens
4  reminded me of a question I forgot to ask before.
5          How come after Lance resigned you
6  were able to pay him in a lump sum but before he
7  resigned you weren't able to?
8      A   Don't know.
9      Q   Has Craig Stevens been debted the entire
10 amount already?
11     A   I'm not sure he has.  I don't believe so.
12     Q   Your attorneys have produced notes from
13 the Mars System, I guess is what you call it, about
14 calls between Schwab and the customers of Lance, are
15 all of the documents that were produced by your
16 attorneys pertinent to local conversations with
17 customers, in other words, not involving the people
18 in Indianapolis?
19     A   It depends on the note in Mars, so I'd
20 have to actually see the note to tell you who the
21 person was.  Each person that speaks and makes a
22 note in Mars has a beta i.d. assigned to them.  If
23 you show me something specific I can answer it.
24     Q   Show me on the first one where the beta
25 i.d. is and I'll run through them quickly.

1      A   Right here (Indicating).
2      Q   Those are initials or something?
3      A   Yeah, four letters and numbers.
4      Q   So let's just go through these, 1I or LUJ,
5  who is that?
6      A   I'm not sure who that is.
7      Q   I mean are these initials or a code?
8      A   It's a code, beta i.d. used -- each
9  employee of Schwab has a beta i.d. assigned to them.
10 Whenever they make a note in the system it's their
11 beta i.d..
12     Q   NPNC?
13     A   NPNC, did you say?
14     Q   Yes.
15     A   Nick Carr, consultant in the Naples
16 branch.
17     Q   How about 1LYU?
18     A   I'm not sure who that is.
19     Q   Somebody whose last name begins with a U?
20     A   Nobody in my branch.
21     Q   MPOB, as in boy?
22     A   That's John O'Brien.
23     Q   GSBH?
24     A   Barbara Hassit.
25     Q   Something tells me the last two letters

1  correspond with initials.
2      A   You got it.
3      Q   Where is the -- how do you decipherer
4  this, is there a sheet you look at to decipher the
5  codes?
6      A   You can look them up.
7      Q   On?
8      A   One of our internal screens, sort of a
9  white pages.
10     Q   Again, UJ, there's no one that has --
11         MR. MCMURRY:  UJ is Joy, Jaime was IYIYU.
12     A   That's Lance's team.
13     Q   NP MP?
14     A   That would be Naples or Ft. Myers.
15     Q   EL?
16     A   Elliot Legates.
17     Q   And then LI?
18     A   Is it LJ, that's me.
19     Q   Okay.  NPCS?
20     A   Craig Stevens.
21     Q   Are you aware that during certain of these
22 conversations derogatory things were said about
23 Lance?
24     A   No, not aware.
25     Q   Were you -- 1RJN?

1      A   Don't know.
2      Q   Are aware of a conversation with one
3  client where the client was told that Lance had
4  caused a $250,000 loss in a very short period of
5  time in a client's account?
6      A   No, I was not.
7      Q   What safeguards did you put in place to
8  make sure that nothing disparaging was said about
9  him in all these phone calls by all these different
10 people?
11     A   Basically a conversation I had with my
12 team the day he left letting them know exactly that,
13 not to make any disparaging remarks towards Lance.
14     Q   Did you put anything in writing?
15     A   No.
16     Q   What were they supposed to say about
17 Lance, call up a client and say, hi, Mrs. Whoever,
18 I'm calling because --
19     A   -- I instructed the team to inform them
20 that Lance had left and they'd be taking care of
21 them going forward.
22     Q   What if a client asked why he had left,
23 what would they say?
24         MS. GUERETTE:  Excuse me, I want to go off
25 the record a second.

6 (Pages 21 to 24)

1          (Discussion off the record.)
2     DIRECT BY MR. ALDRICH: (CONT'D)
3     Q     We just had a discussion off the record
4     about whether anything was put in writing to --
5     concerning Lance's departure and what should or
6     shouldn't be said about that. Has the off the
7     record discussion in any way refreshed your memory
8     on that subject?
9     A     I do recall a letter going out at some
10    point.
11    Q     Who authored the letter?
12    A     I'm not sure.
13    Q     When is the last time you saw this letter?
14    A     Probably right around the time of Lance's
15    resignation.
16    Q     What was your team supposed to say if
17    someone specifically asked why did Lance leave
18    Schwab?
19         MS. GUERETTE: If you know.
20    A     I really don't know. All I instructed
21    them to do is basically say Lance left and going
22    forward -- Lance decided to leave Schwab for
23    whatever reason, going forward they'd work with them
24    in a capacity such as Lance was previously at
25    Schwab.

1     Q     Am I characterizing this or summarizing
2     this correctly when I say you just left it up to
3     whoever was talking to the customer to come up with
4     something if the client asked them why Lance had
5     left?
6          MS. GUERETTE: I want to object, I think
7          that makes an assumption they'd come up with
8          something instead of saying they don't know.
9     Q     Did you tell the people to say they don't
10    know?
11    A     Did I tell them to say they don't know why
12    he left?
13    Q     Yeah.
14    A     Basically it was Lance's decision to
15    leave, they didn't know. I obviously didn't know
16    why he left.
17    Q     Is that what you told them to say if a
18    client asks you why did Lance McMurry leave Schwab
19    did you say to them I don't know, is that what you
20    were supposed to say?
21         MS. GUERETTE: Objection. Asked and
22         answered. Go ahead.
23    A     I really don't recall that ever coming up
24    in a conversation.
25    Q     Weren't there clients very upset,

1     according to many of the Mars notes I read, clients
2     very upset he had left; isn't that true?
3          MS. GUERETTE: Again, if you know.
4     A     I'm not sure.
5     Q     Haven't you seen any notes?
6     A     None of the clients I spoke with.
7     Q     None of them were upset, they didn't care?
8     A     I don't know that they didn't care but
9     they weren't upset.
10    Q     So at no time -- let me try it this way.
11    You, in your position as basically quarter backing
12    this effort to retain the clients, did not think it
13    was prudent to give the people who were making the
14    calls some idea how they should respond to the
15    question why did Lance leave Schwab?
16    A     I really don't recall having that
17    conversation.
18    Q     And as you sit here today, you don't
19    recall, as far as you know personally or from what
20    you heard from your fellow workers at Schwab, no
21    client asked that question as far as you know; is
22    that right?
23    A     It was never -- the question never came
24    back to me so no, I'm not aware of it.
25    Q     How -- have you ever had to retrieve a

1     tape before from the call center, a tape of a
2     conversation or digital, however it's kept, to
3     collect a trade or for some purpose?
4     A     Not that I'm aware of. I'm sure I might
5     have at some point throughout the two years I've
6     been in management I might have, I can't recall
7     specifically what it might have been.
8     Q     Do you recall specifically how long it
9     takes?
10    A     To get a tape?
11    Q     Yeah.
12    A     Not sure.
13    Q     Do you recall the letter we were speaking
14    of a few minutes ago about Lance's departure, you
15    recall it went out but can't recall who wrote it, do
16    you recall anything it said?
17    A     To inform the clients that he had, in
18    fact, gone to Banc of America, if they had asked,
19    and I believe it also reminded us not to use any
20    disparaging remarks towards Lance.
21    Q     Ever tell or hear someone else -- hear
22    that someone else told customers they just don't
23    know where he went?
24    A     No.
25    Q     With reference to this problem you have

1   with a customer and the Schwab yield plus fund, have
2   you attempted to pull any tapes of conversations
3   pertinent to that?
4       A   No.
5       Q   So if a client asked where to reach Lance
6   your staff was supposed to say at Banc of America?
7       A   Banc of America, right.
8       Q   By the way, in the last two years since
9   you've been in management, have you had any
10  conversations with any other broker dealer firm
11  about you leaving Schwab?
12      A   No.
13      Q   Has any client told you or told someone
14  working with you, in contacting Lance's clients,
15  that Lance initiated a solicitation with said
16  client?
17      A   Say that one more time.
18      Q   Has any client of Schwab and Lances, when
19  he was there, told you or anyone working with you
20  that after he left he had initiated a solicitation
21  of that client?
22      A   Yes.
23      Q   What client told you that?
24      A   I don't recall, there were several though.
25      Q   And did you make notes of that

1   information?  I haven't seen that in the notes, I'm
2   wondering if I missed it.
3       A   I think just in conversation the
4   consultants would confide in me the clients told
5   them Lance basically asked them to switch over, come
6   over to Banc of America.
7       Q   No note was made of who those particular
8   clients were as far as you know?
9       A   I'm sure there are notes somewhere but...
10      Q   Where are they, I haven't seen them, can
11  you direct me to those?
12      A   It could be a note that the consultant
13  just wrote themself that the client had this
14  conversation with Lance.
15      Q   Did you save those?
16      A   I probably have the names somewhere that I
17  can recall.
18      Q   The notes that the consultant wrote down
19  that you refer to?
20      A   I don't believe I do have any notes saved.
21  They're basically verbal conversations we had.
22      Q   So they weren't notes?
23      A   None that I can recall.
24      Q   When you said a few minutes ago they've
25  written down notes, you were mistaken when you said

1   that?
2           MS. GUERETTE:  I think he said they could
3       have.
4       A   They might have written down a name, I'm
5   not certain.
6       Q   Certainly you haven't made a effort to
7   find that out, if they wrote it down, since you
8   don't have any notes?
9       A   I guess that's accurate.
10      Q   By name can you identify a single customer
11  that said Lance McMurry solicited them?
12      A   One I personally spoke to would be the son
13  of Martha
14      Q   Does he have a name?
15      A   I'm not sure.  I basically got a call from
16  Martha        son one morning very upset saying
17  that his mother was called by Lance, and he
18  described it as sort of Lance being predatory
19  towards his mom who had just lost her husband, they
20  were going on a vacation very shortly and he was
21  trying to get her to come meet before the trip to
22  Europe I believe it was.
23      Q   You received a call from Martha's son
24  saying Lance is being predatory toward Martha, did
25  you consider that to be a important piece of

1   information?
2       A   Yes.
3       Q   Can you direct me to a note that says
4   Lance was being predatory towards Martha, is it in
5   here somewhere?
6       A   I believe it's in my affidavit.
7       Q   Do we have a note, a contemporaneous note?
8       A   No.
9       Q   Where you wrote down about the predatory
10  conduct?
11          MS. GUERETTE:  Other than communications
12      with counsel.
13      A   No.
14      Q   And why didn't you write that down?
15      A   It's something I wouldn't forget.
16      Q   Really?  When was that conversation, tell
17  me the day?
18      A   A few days after Lance resigned.
19      Q   You don't know when it was?
20      A   Not specifically, but I wouldn't forget
21  the conversation.
22      Q   If you had written the note, you would
23  know when it was?
24      A   Perhaps.
25      Q   And you'd also be able to remember the

8 (Pages 29 to 32)

1  name of the son of Martha if you had written a note?
2      A   Perhaps.
3      Q   And if you had written a note perhaps you
4  could tell me more exactly what the son of Martha
5  said on the day that you can't recall that it
6  happened, right?
7      A   That's true.
8      Q   Upon hearing of the predatory behavior,
9  did you pick up the phone and call Martha?
10     A   I spoke with -- yes. I left a message
11  with Martha and also spoke to Barbara Hassit, the
12  consultant who referred Martha to Lance at Schwab.
13     Q   Did Barbara Hassit confirm there was
14  predatory conduct?
15     A   She had said Martha was upset that Lance
16  called her and was feeling pressured to do
17  something.
18     Q   Where did the word predatory come from, is
19  that something the son of Martha said to you?
20     A   The son. The son.
21     Q   That's an exact --
22     A   -- it's a word I wouldn't forget.
23     Q   And so when Barbara Hassit told you that
24  Martha told her that Lance told Martha he was trying
25  to pressure her to do something, did you make a note

1  of that conversation?
2      A   I made a mental note of the conversation.
3      Q   This is another important conversation for
4  which there's absolutely no documentation
5  whatsoever; is that correct?
6      A   I don't have documentation of the
7  documentation.
8      Q   And Barbara, where is her documentation,
9  did she document the call?
10     A   She let me know of the conversation she
11  had.
12     Q   No one wrote anything down?
13         MS. GUERETTE: If you know.
14     A   I'm not sure, she might have put a note in
15  Mars.
16     Q   Did you look and see because I haven't
17  seen it, I'm wondering did you find that note?
18     A   I have not.
19     Q   How do you search the notes, coming up
20  with all these notes and codes --
21     A   -- search by client.
22     Q   By client and it pops out?
23     A   Correct.
24     Q   So I presume as to Martha a search has
25  been done and no note was located speaking of

1  predatory conduct?
2      A   I haven't done a search, no.
3      Q   Anyone from Indianapolis speak with
4  Martha?
5      A   Yes.
6      Q   So they'll be a tape?
7      A   Did you say Martha?
8      Q   Yes.
9      A   I'm not sure. They spoke with several
10  clients, I'm not sure with Martha.
11     Q   Any of your calls taped?
12     A   No.
13     Q   Any of your calls in your branch with any
14  clients taped?
15     A   No.
16     Q   To clarify, the taping of the calls, I
17  realized you said with call centers they're taped
18  but some -- we're a little confused. If a customer
19  calls an 800 number to Schwab, is that call taped?
20     A   Yes.
21     Q   If a customer calls an 800 number, can
22  they get to your office?
23     A   If it's transferred.
24     Q   Is it possible some calls between your
25  office and customers were, in fact, taped?

1      A   I don't know.
2      Q   Let me ask you about one of these Mars
3  notes, it's Schwab confidential document 4 zeros 83,
4  I'll show it in a second, this is a -- NPNC note,
5  is that -- who's that again?
6      A   Nick Carr.
7      Q   Okay. Nick Carrr says, quote, "Spoke with
8  Jim, unaware of Lance leaving. Brought him up to
9  speed. Seemed okay. Said he was surprised we
10  didn't keep him." Goes on to say other things after
11  that. Read that and I'll ask you a question about
12  it.
13     A   Okay.
14     Q   What do you make of the comment that the
15  customer is surprised that Schwab didn't keep Lance
16  as though he was fired?
17     A   I don't know.
18     Q   Have you seen this before?
19     A   No.
20     Q   Have you talked with Nick about customers
21  perhaps having the impression Lance had been fired?
22     A   No.
23     Q   You remember -- you reviewed your
24  affidavit before today in order to be prepared?
25     A   Yes.

1    Q   In your affidavit you -- you did your
2  affidavit under oath, right?
3    A   Yes.
4    Q   So and -- you also said, "I acknowledge
5  the facts stated herein." End quote. You remember
6  saying that in your affidavit?
7    A   Yes.
8    Q   One of the things you say in your
9  affidavit is, quote, "Mr. McMurry's letter follows
10  an old and disturbing pattern first hatched by
11  another broker that resigned from Schwab that joined
12  B of A also represented by Mr. Aldrich." What is
13  the old and disturbing pattern you were swearing to
14  tell the truth about there?
15    A   I had learned of employees of Schwab
16  leaving to go to Banc of America and basically
17  following the same protocol of reaching out to
18  clients to tell them where they had gone and
19  soliciting business.
20    Q   Okay. You learned of employees, is that
21  what you mean by the old and disturbing pattern?
22    A   Yes.
23    Q   What's old and disturbing about someone
24  resigning and going to another company?
25    MS. GUERETTE:  I don't think that's what

1  he said.
2    MR. ALDRICH:  I want to know --
3    MS. GUERETTE:  -- I don't want you to
4  mischaracterize what he said.
5    MR. ALDRICH:  I can put you under oath and
6  --
7    MS. GUERETTE:  -- he didn't say that's
8  what was old and disturbing.
9    MR. ALDRICH:  Don't coach the witness.
10    MS. GUERETTE:  I don't want you to
11  mischaracterize what he said.
12    MR. ALDRICH:   He can say what he means.
13  DIRECT BY MR. ALDRICH:  (CONT'D)
14    A   What is disturbing to me is clients,
15  Schwab clients, being solicited by a former employee
16  of Schwab and taking their business over there.
17    Q   Okay. The statement is, quote, "Old and
18  disturbing pattern first hatched by another broker."
19  End quote. What was the old and disturbing pattern
20  hatched by another broker?
21    MS. GUERETTE:  I'll object. It was asked
22  and answered.
23    A   I think I stated the employees of Schwab
24  who left to go to Banc of America that took Schwab
25  clients with them to Banc of America by soliciting

1  those clients, that's disturbing to me.
2    Q   "Hatched by another broker that resigned
3  from Schwab." You're referencing a specific broker.
4  He came up with an idea to solicit clients and take
5  them to another firm?
6    A   That's my perception.
7    Q   It was invented by this person you name in
8  the next sentence, Mr. Javier Avilias, he hatched
9  the plan to solicit clients and take them to another
10  firm, is that what you're swearing?
11    A   The pattern I saw was former Schwab
12  employees that left to go to Banc of America.
13    Q   What was hatched by Mr. Avillas?
14    MS. GUERETTE:  I'll object again. You're
15  asking the same question over and over.
16    Q   You have knowledge of it you say, where
17  does your knowledge of the old and disturbing
18  pattern hatched by Mr. Avilias come from?
19    MS. GUERETTE:  I need to object on the
20  grounds you can't answer it if it will involve an
21  attorney client communication, if there's
22  anything other than that you can answer it.
23    A   Again, I go back to what's disturbing to
24  me when Lance resigned was that he was taking Schwab
25  clients with him, soliciting Schwab clients, that's

1  disturbing to me, that's what I meant by that.
2    Q   What I want to know, you swore you had
3  knowledge of the things that we've been talking
4  about here, specifically the old and disturbing
5  pattern first hatched by Javier Avillas, and I want
6  to know where your knowledge of that came from?
7    A   I knew he had left Schwab and gone to Banc
8  of America.
9    Q   Where did you -- how did you find out
10  Mr. Avilias hatched an old and disturbing pattern?
11    MS. GUERETTE:  Other than through
12  communications with counsel.
13    A   Other than communications with Susan, I
14  don't have any knowledge of that.
15    Q   Well, you put this in an affidavit so I
16  don't think that you can, having sworn it in front
17  of a federal judge, refuse to tell me what the basis
18  of this was, so what you're telling me was your
19  lawyers told you about an old and disturbing
20  pattern?
21    MS. GUERETTE:  I'll object on the basis
22  I'm not letting him testify to attorney client
23  communication. We attached the opinion in the
24  Avillas case, he had the opinion when he swore
25  to this. Beyond that --

1    MR. BRODIE: -- Susan, you're coaching the
2    witness again. Respectfully, you're doing it
3    throughout the entire deposition, I stood back
4    and not objected. Every time a question is
5    pending you do, you don't need to do anything
6    other than object to form. He understands he's
7    not to make any comments about attorney client
8    discussions.
9    MS. GUERETTE: Maybe I misunderstood. I
10   thought Peter was saying he was saying he needs
11   to, I thought he was now saying he needs to
12   testify to attorney client communications. If
13   he is not demanding that, you're right. I
14   thought Peter was saying he was insisting --
15   MR. BRODIE: -- Peter's saying you can't
16   hide behind a shield of attorney client
17   privilege where you stated in an affidavit to a
18   federal judge a conclusion, you need to set
19   forth the basis of that conclusion. If he's
20   hiding behind the conversation of my attorney,
21   state it, it's going to come out and I'll have
22   it ruled upon.
23   MS. GUERETTE: That's fine. If that's
24   what he was saying. I thought Peter said he's
25   insisting on an answer now, if it's a fight for

1    another day, that's fine. I thought he was
2    insisting he answer now and that's why I
3    objected.
4    DIRECT BY MR. ALDRICH: (CONT'D)
5    Q    Your answer is you have no knowledge
6    other than conversations with your attorney?
7    A    Yes.
8    Q    The statement, quote, "Although
9    Mr. Avilias claimed he did not take Schwabs'
10   records, it's undisputed he recreated Schwabs'
11   customer list from memory shortly after
12   resignation." You have no personal knowledge of
13   that, do you?
14   A    Only through my counsel.
15   Q    And the statement, "It is also undisputed
16   Mr. Avilias used the re-created Schwab customer list
17   to contact Schwab customers by telephone," end
18   quote. There again you have absolutely no personal
19   knowledge of that, do you?
20   A    Only through counsel.
21   MR. ALDRICH: Let's take a short break to
22   organize my thoughts here.
23   (Whereupon a break is taken from 3:33 to 3:49.)
24   BY MR. ALDRICH: (CONT'D)
25   Q    Does your office have to pay the

1    attorney's fees associated with the suit against
2    Lance and Banc of America?
3    A    I don't know.
4    Q    Are you paid based upon the profitability
5    of your office?
6    A    No.
7    Q    Doesn't matter if your office losses money
8    you get paid the same thing?
9    A    Yes.
10   Q    How about if Schwab obtains money in this
11   case, does it flow to your office in any way that
12   you're aware of?
13   A    Not that I'm aware of.
14   Q    Do you have to approve invoices for the
15   attorneys on this?
16   A    No.
17   Q    Are you involved in that process?
18   A    No.
19   Q    Do you see them?
20   A    No.
21   Q    How many clients of Schwab did Lance
22   improperly solicit?
23   A    I'm not sure.
24   Q    Can you give me some kind of estimate,
25   you're suing him, I wonder if you have any idea how

1    many improper solicitations there have been?
2    A    What do you mean by improper?
3    Q    By solicitations that you regard as having
4    violated his contract with Schwab?
5    A    I couldn't put a number on it.
6    Q    Is it less than five?
7    A    No, I'd say probably more than five.
8    Q    Is it more than ten?
9    A    Probably.
10   Q    Is it more than 15?
11   A    I don't know. If I have to put a number
12   on it I'd say every client he contacted in my
13   opinion.
14   Q    So he has improperly solicited every
15   single client he contacted, is that your testimony?
16   A    Once again I'll say I don't know because I
17   don't know what was said specifically.
18   Q    Well, you're suing him, aren't you, you're
19   claiming he said something wrong, right?
20   A    Um'hum.
21   Q    That was a yes? You have to say yes for
22   the record instead of grunting.
23   A    Yes, based on the solicitation in the
24   non-compete clauses that he signed.
25   Q    So in your view, you've testified at

11 (Pages 41 to 44)

1  length about those clauses in your affidavit I see,
2  in your view if Lance called up a client and said
3  hi, just letting you know I resigned so you can't
4  reach me at Schwab anymore, that was a solicitation?
5      A    Not necessarily.
6      Q    What does it take to make it into a
7  solicitation in your view?
8      A    Basically making the impression that you
9  want the client to move their business to Banc of
10 America.
11     Q    So if in the calls, in a call to a given
12 client if he didn't convey that impression, if he
13 just said hi, Mrs. Jones, I've known you for a long
14 time, I want to let you know I'm not at Schwab
15 anymore, someone there will continue to watch over
16 your accounts, that would not be a solicitation, you
17 agree with that?
18     A    If he says there's someone there -- say
19 that again.
20     Q    I'm not there anymore but someone else can
21 take over your account at Schwab, that would not
22 count as solicitation, do you think?
23     A    I couldn't say for sure.  I'd have to know
24 more about the conversation.
25     Q    Well, what do you need to know about the

1  conversation, exactly what was said?
2      A    It would depend on the conversation, yeah.
3      Q    What have you done to learn all about
4  Lance's conversations with the customers so you
5  could make the assessment whether he violated his
6  contract?
7      A    I haven't done anything like that.
8      Q    So why are you suing him then, has anyone
9  else done that?
10     A    Not that I'm aware of.
11     Q    You're just assuming that he did something
12 wrong and you're suing him because you're assuming;
13 is that right?
14     A    We're suing him because he violated the
15 agreement that he signed.
16     Q    How do you know if you haven't checked
17 with any of the clients?
18     A    I haven't heard specific conversations
19 between Lance and the client so I couldn't say.
20     Q    You haven't even asked the clients what he
21 said, have you?
22     A    Have I?
23     Q    Right.
24     A    There may have been a client or two I had
25 a conversation with.

1      Q    Have you in any systematic way, yourself,
2  or directed anyone else, to call up clients and ask
3  them what did Lance say to you when he spoke to you
4  after he resigned from Schwab to develop information
5  about those conversations to base your suit on, you
6  or anyone else done that?
7      A    No.
8      Q    I have no further questions.
9  CROSS BY MR. BRODIE:
10     Q    I want to ask a couple of questions
11 following up earlier responses you had to Peter's
12 questions.
13          The call that you said came in, was it
14 Martha --
15     A    -- Martha.
16     Q    Her son?
17     A    Yes.
18     Q    You recall specifically the word predatory
19 being used?
20     A    Yes.
21     Q    What else can you tell me as you sit here
22 today you recall specifically, exact words, telling
23 you during that phone conversation?
24     A    His mother was very upset --
25     Q    -- I'm not asking you in your conclusions,

1  your interpretations or -- I'm asking if you recall
2  the exact words that he used.
3      A    I do not recall the exact words.
4      Q    The only exact word you recall him using
5  was the word predatory?
6      A    Yes.
7      Q    Where does he live?
8      A    I believe her son lives, I'm not sure, I
9  think it's Texas.
10     Q    And where were you at the time you
11 received the call?
12     A    Ft. Myers.
13     Q    How did you come to receive the call?
14     A    He -- I received an email from Barbara
15 letting me know she had spoken to Martha, reaching
16 out to Martha, and Martha was upset and her son was
17 also upset that Lance was contacting his mother.
18     Q    So who called --
19     A    His call -- he called in and the call was
20 transferred, as I recall, transferred to the Ft.
21 Myers office that's how I got the call.
22     Q    That's what I wanted to get at.  The call
23 wasn't direct to you, it went through an 800 center
24 and transferred to you?
25     A    I believe.

1  Q   There would be a recording of that
2  conversation if all the 800 calls are recorded,
3  correct?
4  A   I don't know.
5  Q   You don't know?
6  A   I can't say for sure the call was
7  recorded. I believe I recall the call was
8  transferred in from --
9  Q   -- let's back up. If it went into an 800
10 number it would have been recorded, correct, if it
11 was called in on one of the 800 numbers in the call
12 center?
13 A   Yes. Yes. Once it is transferred to me
14 it's not record anymore.
15 Q   How do you know that?
16 A   None of the lines in the branches are
17 recorded.
18 Q   Have you ever tried to retrieve a call
19 that originated through an 800 number?
20 A   No.
21 Q   You don't know for sure, you're guessing
22 as you sit here that it wasn't recorded?
23 A   To my knowledge the call was not recorded.
24 Q   Is there a way for you to find out if
25 calls are recorded that are transferred from an 800

1  number?
2  A   I'm not sure, never been asked the
3  question.
4  Q   Who would know?
5  A   Don't know.
6  Q   Nobody in your company would know?
7  A   I can't say who.
8  Q   Are you involved or were you involved in
9  the initial decision to bring the lawsuit against
10 Mr. McMurry?
11 A   Say that again.
12 Q   Did you participate in the initial
13 decision to bring this lawsuit?
14 A   What do you mean by did I participate?
15 Q   Were you consulted, did you have to give
16 approval?
17 A   No.
18 Q   Anybody ask you if you think we should
19 bring the lawsuit?
20 A   No.
21 Q   Do you think the lawsuit should have been
22 brought against Mr. McMurry?
23 A   Yes.
24 Q   Did you communicate this with anybody?
25 A   I might have.

1  Q   Do you recall specifically?
2  A   No.
3  Q   And when did you come to the conclusion
4  that the lawsuit was proper to be brought against
5  Mr. McMurry, before or after?
6  A   Before or after?
7  Q   Before or after it was actually filed
8  against him.
9  A   Oh, before.
10 Q   You remember that distinctly, what brought
11 you to that conclusion?
12 A   The fact he was, in my opinion, soliciting
13 clients, I felt it was right to pursue it.
14 Q   Other than the son of Ms. Martha and these
15 two other people Joy and John I think you mentioned
16 --
17 A   -- Jaime.
18 Q   Any other client you directly communicated
19 with that informed you they were solicited by
20 Mr. McMurry?
21 A   There was probably a few others but I
22 couldn't recall the names specifically right now.
23 Q   Mr. Aldrich showed you, read from your
24 affidavit earlier that you submitted with respect to
25 the federal court proceedings, did you prepare that

1  affidavit?
2  A   With counsel.
3  Q   You worked with counsel in preparing it?
4  A   Yes.
5  Q   And what did you have before you, any
6  documentation you relied on in providing the
7  information for that affidavit?
8  A   No.
9  Q   Are there any representations in that
10 affidavit that were suggested to you by counsel that
11 you, that -- excuse me, that you didn't generate but
12 were suggested to you by counsel?
13 A   Not that I recall.
14 Q   Well, you testified earlier that at least
15 one representation, the one with respect to
16 Mr. Avilias hatching this plan to solicit clients
17 and that was based -- that representation was based
18 on, as far as you can recall, information given to
19 you by counsel.
20 A   Yes.
21 Q   Is that right?
22 A   Yes.
23 Q   Now your counsel, you heard your counsel
24 object when I asked you what that information was,
25 are you still objecting here today to the

13 (Pages 49 to 52)

1 information that he relied upon or was given to
2 state the conclusions in that affidavit that he did?
3    MS. GUERETTE: Are you asking if he's
4    going to testify as to what counsel told him
5    what the discussions were with counsel?
6    MR. BRODIE: Absolutely. To the extent
7    the discussions with counsel were included in a
8    affidavit that was filed with the court, I want
9    to know everything that was discussed with you
10   or any other counsel.
11   MS. GUERETTE: We're objecting.
12   MR. BRODIE: You're objecting to that.
13   Not withstanding the discussions were
14   incorporated into an affidavit filed with the
15   court?
16   MS. GUERETTE: Um'hum.
17   MR. BRODIE: Okay. Mark that, please.
18 CROSS BY MR. BRODIE: (CONT'D)
19   Q   Do you have any independent knowledge Banc
20 of America did anything improper with respect to
21 Mr. McMurry or Schwab?
22   A   No.
23   Q   Are you aware of anybody at Schwab telling
24 you that Banc of America did anything improper?
25   A   I'm not aware.

1    Q   Have you done any determination as to
2 whether or not Schwab has been damaged by any
3 actions of Banc of America?
4    A   That's a question that's difficult to
5 answer because, you know, the business that could be
6 lost would equate to damages or equate to a number
7 that would directly hurt my branch or Schwab.
8    Q   You could lose business simply by the
9 virtue of a client voluntarily wanting to go with
10 Mr. McMurry and go to Banc of America?
11   A   Sure.
12   Q   You're not sitting here saying that's
13 damages Banc of America or Mr. McMurry would be
14 responsible for, is it?
15   A   If the client was solicited by Mr. McMurry
16 then yes I would feel that way.
17   Q   If a client transferred, wasn't solicited
18 by Mr. McMurry, chose to transfer without any
19 solicitation on his part, would that constitute
20 damages to Schwab that you think Mr. McMurry or Banc
21 of America should be held responsible for?
22   A   I guess my view is that if he had contact
23 with that client and that client transferred to Banc
24 of America then yes.
25   Q   So your position now, not withstanding the

1 fact that you testified earlier that you didn't see
2 any problems with Mr. McMurry telling a client where
3 he could now be reached, it's now your testimony
4 that any contact that Mr. McMurry had with a client,
5 if that client transferred, you think that
6 Mr. McMurry and Banc of America should be held
7 financially responsible for Schwab's loss of that
8 client?
9    MS. GUERETTE: I'm going to object. I
10   think it mischaracterizes his earlier
11   testimony. You can answer it if you can.
12   A   I'm not sure. In my view, you know, I'd
13 have to know exactly what was said to the client
14 which I don't know but, you know, in my opinion, you
15 know, any contact that was initiated was initiated
16 for the reason of an account being transferred to
17 Banc of America.
18   Q   Could you imagine a possibility where
19 Mr. McMurry contacted a client that was not for the
20 purpose of solicitation?
21   A   It wouldn't make sense to me.
22   Q   Did you instruct the representatives who
23 were calling clients previously serviced by
24 Mr. McMurry, did you ever instruct them to provide
25 Mr. McMurry's contact information if they requested

1 it?
2    A   Yes.
3    Q   And was that a verbal instruction or in
4 some writing?
5    A   It was in a communication that was sent
6 that we discussed earlier.
7    Q   The letter?
8    A   The letter and also a verbal communication
9 between myself and my team.
10   Q   How many -- what did you have a big group
11 meeting right after he left with your team?
12   A   Some individual meetings with my
13 consultants.
14   Q   What was the first meeting you had?
15   A   I don't recall.
16   Q   Immediately after he left that same day?
17   A   I'm sure it was.
18   Q   Do you remember how many people were
19 present?
20   A   The entire Ft. Myers office.
21   Q   That was the first meeting and at that
22 time you told them, gave them the verbal
23 instructions at that meeting?
24   A   Yes.
25   Q   When was the next meeting?

14 (Pages 53 to 56)

1    A    I spoke to my team in Naples because I was
2  in Ft. Myers when Lance resigned, I communicated
3  with them that he left.
4    Q    You did that how?
5    A    Over the phone.
6    Q    A conference call, you were put on
7  speaker?
8    A    I called each one individually.
9    Q    Did that occur that night?
10    A    It occurred immediately.
11    Q    The same day?
12    A    Yes.
13    Q    You called everybody in the branch?
14    A    Yes.
15    Q    And you spoke to everybody?
16    A    Unless someone was out of the office that
17  day, I don't recall.
18    Q    Were there any -- did you or anybody else
19  ever instruct your employees to take any notes that
20  would be important to take notes about the
21  conversations they had with the customers when they
22  called them?
23    A    No, it's pretty standard that when a rep
24  has a conversation with a client they document the
25  conversation in our system.

1    Q    Okay. Any conversations that were
2  important that the reps had with the clients would
3  be documented in the system?
4    A    I can't say for sure.
5    Q    That was your standard policy?
6    A    Not a policy, sort of a practice we
7  followed.
8    Q    Do you have a policy on Mars entries?
9    A    What do you mean?
10    Q    A written policy regarding Mars, verbal
11  instruction, is there a class?
12    A    Not particularly, nothing specific.
13    Q    Just entered randomly based on what the
14  individual feels to be important at that time?
15    A    Right.
16    Q    The other instances you've only had a
17  handful of conversations with customers which you're
18  claiming you feel the content of the conversations
19  amounted to a solicitation, the rest of them you
20  know second hand from conversations you had with
21  employees that have spoken with customers?
22    A    Right.
23    Q    Did the employees, when they communicated
24  with you what they felt was a solicitation, did they
25  communicate to you the exact words that the customer

1  said to them that they felt constituted a
2  solicitation?
3    A    I don't recall.
4    Q    Did they -- a single one of them provide
5  you any written note to the exact words said to them
6  that constituted a solicitation?
7    A    I don't think so, but I don't recall.
8    Q    Based on your testimony today, you'd agree
9  that the specific words that were used in a
10  conversation are essential in determining whether or
11  not that call actually constituted a solicitation?
12        MS. GUERETTE:  I'll object. I'm not sure
13     that accurately reflects the testimony, but you
14     can answer.
15    A    Again, I'll go back to it's a matter of
16  opinion.
17    Q    You'd have to know exactly what was said
18  to evaluate whether it was a solicitation or not?
19    A    I didn't speak to clients so I can't
20  interpret what someone elses conversation, what
21  their perception of the conversation was, whether it
22  was a solicitation or not.
23    Q    Exactly.
24    A    In my opinion if it comes back to me it
25  was a solicitation in essence my team is telling me

1  he is out their soliciting our clients.
2    Q    Did you ask any employee that told you a
3  customer was solicited, did you ask them what they
4  based their conclusion on?
5    A    I'm sure I did but I can't recall.
6    Q    You can't recall one instance?
7    A    Other than what I described as basically
8  saying Lance was asking them to switch over or set
9  up meetings, you know, to come in and see him and,
10  you know, it all goes back, in my opinion, to the
11  reason he made that contact to begin with wasn't to
12  simply say hello, I'm at Banc of America now, it's
13  to earn their business for that company.
14    Q    That's your opinion?
15    A    Yes.
16    Q    You don't know that because Mr. McMurry or
17  anyone told you that?
18    A    No, that's the nature of the business.
19    Q    That's the nature of the business. Are
20  these employees, you'd agree they have an interest
21  in wanting to keep Mr. McMurry from contacting these
22  clients, wouldn't you?
23    A    They have an interest -- say it again.
24    Q    They have an interest, they'd have a
25  desire to prevent Mr. McMurry from taking these

1  clients to Banc of America, wouldn't they?
2     A   What do you mean they'd have an interest?
3     Q   If the client stayed at Schwab that would
4  result in greater assets for them to manage and
5  greater commissions for them, correct?
6     A   Correct.
7     Q   If they were able to assist you and assist
8  Schwab's attorneys in getting the court to enter an
9  injunction by telling you clients said they were
10 solicited, then that could result in a restraining
11 order against Mr. McMurry and them standing to
12 profit from that financially, correct?
13    A   Once again, they're just protecting Schwab
14 clients by reaching out to those clients, in no way
15 did they disparage Lance or say anything bad about
16 Lance or anything like that, basically we're
17 protecting our clients.
18    Q   And they'd want to please you as well?
19    A   My team?
20    Q   Yes.
21    A   I would hope so.
22    Q   I don't have anything further.
23 CROSS BY MS. STARR:
24    Q   GSMM, you know who that is?
25    A   Mike McCourt.

1     Q   How do you spell that?
2     A   M-C-C-O-R-T.
3     Q   MS?
4     A   Matt Straton.
5     Q   YZ?
6     A   Don't know.
7     Q   Have you ever given a deposition before?
8     A   No.
9     Q   Have you testified in a legal proceeding?
10    A   No.
11    Q   Not an arbitration or court proceeding?
12    A   No.
13    Q   Today is the first time testifying under
14 oath?
15    A   Yes.
16    Q   Ever offer an affidavit like the one
17 submitted in this case?
18    A   No.
19    Q   The one and only time you swore to an
20 affidavit?
21    A   Yes.
22    Q   Would you agree that Schwab was on equal
23 footing to retain the accounts as Mr. McMurry was to
24 move them to B A?
25    A   I don't understand the question.

1     Q   Equal footing.  Did Schwab have just as
2  good an opportunity to retain the assets than to
3  lose them, was there an unfair advantage?
4     A   I would say we had an equal opportunity to
5  keep the business.
6     Q   Okay.  You said that you heard from some
7  people Lance was interfering with customer
8  relationships and you indicated Jaime Constantina
9  and Joy somebody, who is Joy?
10    A   Cadle.
11    Q   How do you spell that?
12    A   C-A-D-L-E.  Ask the question again,
13 please.
14    Q   In your testimony earlier today you
15 indicated you had heard from some people that Lance
16 was interfering with Schwab customer relationships
17 and we asked you who the people were and you
18 identified two people Jaime Constantina and Joy
19 Cadle.
20    A   What do you mean by interfering?
21    Q   That was your words.
22    A   I don't recall -- can we go back to where
23 that was?
24        MR. BRODIE:  Were there any interferences
25    with Schwab customers?

1     A   I don't understand what interferences
2  means in this question.  Solicitation, is that what
3  you're asking me?
4     Q   Inappropriate contact of Schwab clients?
5     A   By Lance?
6     Q   Correct.  You indicated you heard from
7  people -- those are your words, I wrote down what
8  you said.
9     A   I indicated Lance had solicited clients
10 from what I heard from the people you named.
11    Q   You didn't hear it directly from anybody,
12 any of the clients themselves, correct?
13    A   I think I mentioned earlier I had heard it
14 from a few but I can't recall their names.
15    Q   And you don't have any written notes about
16 it?
17    A   No.
18    Q   You keep a day timer or any type of a
19 calendar?
20    A   I keep a day planner.
21    Q   Ever write anything in there about clients
22 --
23    A   -- not about clients, usually just
24 reminders for myself.
25    Q   Would you have had any emails with Laura

1 Jean Roetzel regarding this matter, this case?
2    A   I don't recall. Most of it was in
3 conversations that we had over the phone.
4    Q   Could there be emails?
5    A   I'm not sure, I guess there could be, I'm
6 not sure.
7    Q   Have you been asked to look for them?
8    A   No.
9    Q   Have you been asked to look for any
10 documents in this case?
11    A   No.
12    Q   Any other Schwab employees that you spoke
13 with regarding Lance's departure from the firm,
14 personally, one-on-one conversations?
15    A   About his departure?
16    Q   Correct.
17    A   Probably Jaime and Joy.
18    Q   Anybody else?
19    A   That worked with Lance?
20    Q   Anybody else.
21    A   Not that I recall.
22    Q   How many clients do you think you spoke to
23 that were serviced by Lance?
24    A   To let them know of his departure?
25    Q   Correct.

1    A   I don't recall a number, there were
2 several though.
3    Q   Were you asked to call any clients?
4    A   Was I asked?
5    Q   Yes, by some of the brokers that were
6 reaching out to the clients?
7    A   If they needed a call from me I certainly
8 called a client.
9    Q   Why would they need a call from you?
10    A   I referred a lot of business to Lance,
11 they were my former clients, a lot of them wanted to
12 hear from me.
13    Q   In certain instances were you informed
14 clients were upset and the person who had contacted
15 them thought it would be a good idea if you followed
16 up with a call?
17    A   Not upset. I had a good relationship with
18 a lot of clients, I thought it was the right thing
19 to do.
20    Q   So confidential Schwab document bate stamp
21 00001 that says that somebody, I guess Joy or Jaime,
22 spoke with Bob regarding Lance leaving and he was
23 very concerned and I let him know he'd be getting a
24 call from the branch manager, anybody let you know
25 Bob was very concerned and you'd be calling him?

1    A   Who is Bob?
2    Q   I don't know either. Is there anything on
3 here that would identify who Bob is for us, what are
4 those real long numbers before like --
5    A   -- I can't tell what that is.
6    Q   That's not an account number?
7    A   I don't know.
8       MS. GUERETTE: I don't know either.
9    Q   So how would anybody know who Bob is?
10    A   Those notes are under a client.
11    Q   Okay. Can you explain to me how they're
12 kept in the Mars system?
13    A   How they're kept?
14    Q   Correct.
15    A   Each customer would have an identification
16 number.
17    Q   Is that what this --
18    A   -- I don't know. I don't know.
19    Q   If we were to go through these people here
20 and ask for the Mars -- for the Mars notes to be
21 identified by these people, somebody would be able
22 to tell us which page related to which client and
23 we'd know who Bob is?
24    A   Yes.
25    Q   But we'd have to ask for the

1 identification?
2    A   Okay.
3       MS. STARR: Do you want to do it on the
4 record or off the record? Can you identify for
5 us who the people are?
6       MS. GUERETTE: We have on-going discovery
7 issues.
8       MS. STARR: This is a big one. Along with
9 the tapes we want to know who the people are.
10       MS. GUERETTE: We have documents we're
11 still looking for from you and we'll talk about
12 it at some point after the deposition.
13       MS. STARR: Sure.
14 CROSS BY MS. STARR: (CONT'D)
15    Q   You indicated you told the people that
16 were speaking to clients they should speak positive
17 about Lance and not say anything negative about him?
18    A   Yes.
19    Q   Confidential bate stamp 000106 indicates
20 somebody, YU -- Jaime called somebody by the name of
21 Bruce and Bruce talked to a client -- Jaime talked
22 to the client about how the SPC program should work
23 versus Lance's model, would that be a positive
24 statement in your mind?
25    A   I don't know.

1    Q   You can look at it if you want if it would
2  help you.
3    A   I don't know what that means.
4    Q   There was another one of these Mars notes
5  relating to a Dr.          , confidential Schwab
6  document 00026 that indicates Jaime was going to
7  have to pull some telephone records and that
8  somebody by the name of Randy was going to be
9  retrieving those call records, you know who Randy
10 is?
11   A   Randy is Jaime's manager in Indianapolis,
12 Randy Cox it would be.
13   Q   Randy is the person that would pull --
14   A   -- I don't know.
15   Q   Earlier when Mr. Aldrich was asking on
16 direct examination in connection with your yield
17 plus litigation, is that a case that's on-going?
18   A   No, it's settled.
19   Q   Was a formal arbitration brought?
20   A   No, Schwab settlement.
21   Q   Was there a formal customer written
22 complaint?
23   A   Verbal.
24   Q   And you indicated you did not pull
25 telephone records with respect to that?

1    A   No.
2    Q   Did Schwab pull telephone records?
3    A   Yes.  No.  No.  The records that Schwab
4  had were through the Cat team which is our -- when a
5  customer calls to complain they speak to someone on
6  a Cat team, there's no recordings or tapes with me
7  with the client.
8       MS. STARR:   I don't have further
9  questions.
10      MS. GUERETTE:  We'll read.
11 (Whereupon the deposition is concluded at 4:21 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  THE STATE OF FLORIDA
   COUNTY OF PALM BEACH
2
3
4  I, the undersigned authority, certify that the
5  aforementioned witness personally appeared before me
6  and was duly sworn.
7
8  WITNESS my hand and official
9  seal this 16th day of
10 November, 2008
11
12
13
14
15          JULIE ANDOLPHO, COURT REPORTER
16         Notary Public State of Florida
17         My Commission Expires:12/14/09
18         My Commission # DD499509
19
20
21
22
23
24
25

1
2           C E R T I F I C A T E
3  THE STATE OF FLORIDA, COUNTY OF PALM BEACH
4
5       I, Julie Andolpho, Professional Reporter,
6  do hereby certify that I was authorized to and did
7  report said deposition in stenotype; and the
8  forgoing pages numbered 1 to 74, inclusive, are a
9  true and correct transcription of my shorthand notes
10 of said deposition.
11      I further certify that I am not an
12 attorney or counsel of any of the parties, nor am I
13 a relative or employee of any attorney or counsel of
14 party connected with the action, nor am I
15 financially interested in the action.
16      The foregoing certification of this
17 transcript does not apply to any reproduction of the
18 same by any means unless under the direct control
19 and/or direction of the certifying reporter.
20      IN WITNESS WHEREOF, I have hereunto set my
21 hand this 16th day of November, 2008.
22
23 JULIE ANDOLPHO, COURT REPORTER
   Notary Public in and for the STATE OF FLORIDA
24 My Commission Expires:12/14/09, # DD499509
25

18 (Pages 69 to 72)

Page 73

```
 1
 2              C E R T I F I C A T E
 3              --------------
 4    THE STATE OF FLORIDA
 5    COUNTY OF PALM BEACH
 6
 7         I hereby certify that I have read the
 8    foregoing deposition by me given, and that the
 9    statements contained herein are true and correct to
10    the best of my knowledge and belief, with the
11    exception of any corrections or notations made on
12    the errata sheet, if one was executed.
13
14         Dated the _____ day of_____, 2008.
15
16
17    _____
18    Joseph Lacagnina
19
20
21
22
23
24
25
```

Page 74

```
 1              November 15, 2008
 2
 3    TO:
      FISHER & PHILLIPS, LLP
 4    201 King of Prussia Road, Suite 650
      Radnor, PA  19087
 5    ATT: Susan Guerette/Witness Joseph Lacagnina
 6    RE:  Schwab v. McMurry
 7         Please take notice that on November 6,
      2008 you gave your deposition in the
 8    above-referenced matter.  At that time, you did not
      waive your signature.  It is now necessary that you
 9    sign your deposition.
           Please call our office at the below-listed
10    number to schedule an appointment between the hours
      of 9:00 a.m. and 4:00 p.m., Monday through Friday.
11         If you do not read and sign the deposition
      within thirty days, the original, which has already
12    been forwarded to the ordering attorney, may be
      filed with the clerk of the Court.  If you wish to
13    waive your signature, sign your name in the blank at
      the bottom of this page and return it to us.
14
15              Very truly yours,
16              LEY & MARSAA COURT REPORTERS
17         _____
                JULIE ANDOLPHO
18
19    I do hereby waive my signature:
20    _____
      Joseph Lacagnina
21
22    cc:  Via transcript:
23    Peter Aldrich
24
25
```

Page 75

## Peter Aldrich

**From:** Greco, Michael [mgreco@laborlawyers.com]

**Sent:** Wednesday, July 23, 2008 12:48 PM

**To:** Peter Aldrich

**Subject:** RE: Schwab v. McMurry

I agree, with one clarification. The last bullet point below states: "You will not later controvert my assertion that I - not Schwab - raised this issue, after Schwab sued Lance." You are generally correct. To be clear, I am not aware of Schwab raising this issue. This issue came to my attention by you during our phone call today. That being said, I cannot rule out the possibility that someone at Schwab brought this issue to Mr. McMurry's attention. Of course, I am not aware of that, and I suspect it would be my obligation to demonstrate that if it turns out to be true and if it matters in any way. Thanks. Mike

> -----Original Message-----
> **From:** Peter J. Aldrich [mailto:peter.aldrich@aldrichlaw.net]
> **Sent:** Wednesday, July 23, 2008 12:33 PM
> **To:** Greco, Michael
> **Subject:** Schwab v. McMurry
>
> Mike-
>
> This confirms our discussion about the McMurry case this morning:
>
>     -I informed you that Lance McMurry is owed over $11,000 by Schwab. You were not aware of this before our discussion.
>
>     -I requested that the federal court discovery be expanded to cover this issue, as it might be a defense to the injunction request, under applicable caselaw.
>
>     -The attached document (redacted and original versions) was prepared by Lacagnina and verifies the debt, which pre-dated Lance's resignation. The document was given to Lance by Lacagnina.
>
>     -Today I was going to file an affidavit of Lance, attaching the redacted version of the Lacagnina document, but you asked me not to and instead to send it to you.
>
>     -I stated that this will be a defense to the injunction action and that by giving you the document and time to look at the issue privately, I am not waiving the defense.
>
>     -You will not later controvert my assertion that I - not Schwab - raised this issue, after Schwab sued Lance.
>
> Please confirm that what I have written above is accurate. Assuming your confirmation is forthcoming, I will forebear on filing the affidavit and my motion on expanded discovery, until you have considered the discovery issue. I would like to know Schwab's position on discovery by Friday, in light of your unavailability next week. Thank you.
>
> Peter
>
>
> Peter J. Aldrich, Esq.
> PETER J. ALDRICH, P.A.
> 100 Village Square Crossing, Suite 201
> Post Office Box 32699
> Palm Beach Gardens, FL 33420
> P: 561-775-7797 X4101
> F: 561-775-1075



EXHIBIT ___C___

exception of account relationships of my immediate family or other relatives, or individuals or entities that I provided financial services to prior to joining Schwab, and which I have identified in the accompanying Exhibit B, attached hereto and made a part hereof. I agree that I will undertake to update this Exhibit B, as and when necessary, by written notice to Schwab.

7. I agree that during my employment with Schwab, I will not, directly or indirectly, on my behalf or on behalf of any other person, company or entity, solicit or induce, or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing): (a) any customer or Prospective Customer of Schwab to divert, transfer or otherwise take away any business from Schwab; or (b) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab.

8. I agree that during my employment with Schwab, I will not remove any property of Schwab in original or copied form, including, but not limited to, any Confidential Information existing in any form from Schwab's premises, except as required in the ordinary course of my duties at Schwab and as necessary for me to perform my duties. I agree that I will promptly return to Schwab immediately upon Schwab's request, my acceptance of other employment, or the termination of my employment for any reason, any and all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other property of Schwab in my possession or control, including, but not limited to, any information pertaining and/or relating to Schwab's customers and Prospective Customers, and all originals, copies and derivations of Schwab's documents, electronic and telephonic equipment, credit cards, security badges, and passwords. I further agree that I will permit Schwab to inspect any materials provided by Schwab to me or developed by me as a result of or in connection with my employment with Schwab when I accept other employment or otherwise separate from my employment, regardless of where said materials are located.

9. I further agree that for a period of eighteen (18) months after my employment with Schwab ceases beginning on the date of my termination (the "Proscribed Period"), I will not, directly or indirectly, or on behalf of any third party: (a) solicit or attempt to solicit any existing customers I serviced, directly or indirectly, and/or any Prospective Customers (with the exception of individuals or entities listed in the attached Exhibit B), or customers whose identities I learned as a result of my employment with Schwab, in an attempt to divert, transfer or otherwise take away business or prospective business from Schwab; (b) sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or Prospective Customer of Schwab that I solicited or attempted to solicit in breach of my obligations hereunder; or (c) solicit or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab. I further agree that the purpose of this provision is to prevent the intentional or inadvertent unlawful use of Schwab's Confidential Information, including its trade secrets. Nothing in this Paragraph 9 is intended to prevent me from discussing possible employment or prospective business with any customer, Prospective Customer, employee, consultant or independent contractor who contacts me directly on his or her own volition without my solicitation or attempted solicitation of him or her. I understand that nothing in this Paragraph 9 limits my absolute obligation under Paragraph 4 to never use Confidential Information for any other purpose at any time after my employment with Schwab ceases. Sections (a) and (b) of this Paragraph 9 shall not apply to any institutional customer or institutional Prospective Customer of Schwab Capital Markets L.P. whose identity is publicly available (notwithstanding the provisions in paragraph 6).

10. I represent and warrant that I do not have any agreement(s) with any former employer or other third party that would be breached by my performance of my duties at Schwab or that would limit, impair or otherwise adversely affect my performance of such duties, and that I will not take any action to breach any such agreement while I am employed by Schwab. In any event, I will not use or disclose to Schwab any confidential information that belongs to others. I have listed on Exhibit C to this Agreement all the confidential, proprietary, trade secret, non-solicitation and/or non-competition agreements to which I am subject and affirm that those agreements, if any, would not be breached by performance of my duties at Schwab. I also agree that I will disclose my obligations under this Agreement to any prospective or future employer or contractor and that my obligations under this Agreement in their entirety shall survive the termination of my employment with Schwab regardless of the reason for the termination.

11. I understand and agree that any breach of this Agreement may subject me to disciplinary action, up to and including termination of my employment (if I am still employed at Schwab). I also understand and agree that any breach of this Agreement by me will cause immediate irreparable injury to Schwab that cannot be adequately compensated by money damages or whose damages may be difficult to ascertain. If a court of competent jurisdiction or an arbitration panel finds that injunctive relief is appropriate to enforce any provision of this Agreement, I agree that Schwab is entitled to such injunctive relief, in order to, among other things, prevent a continuing breach or to protect and preserve the status

EXHIBIT D

Schwab's benefit. I acknowledge and agree that any account relationships I develop, enhance, maintain or support during my employment with Schwab are account relationships that belong solely to Schwab and not to me, with the exception of account relationships of my immediate family or other relatives, or individuals or entities that I provided financial services to prior to joining Schwab, and which I have identified in the accompanying Exhibit B, attached hereto and made a part hereof. I agree that I will undertake to update this Exhibit B, as and when necessary, by written notice to Schwab.

8. I agree that during my employment with Schwab, I will not, directly or indirectly, on my behalf or on behalf of any other person, company or entity, solicit or induce, or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing): (a) any customer or Prospective Customer of Schwab to divert, transfer or otherwise take away any business from Schwab; or (b) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab.

9. I agree that during my employment with Schwab, I will not remove any property of Schwab in original or copied form, including, but not limited to, any Confidential Information existing in any form from Schwab's premises, except as required in the ordinary course of my duties at Schwab and as necessary for me to perform my duties. I agree that I will promptly return to Schwab immediately upon Schwab's request, my acceptance of other employment, or the termination of my employment for any reason, any and all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other property of Schwab in my possession or control, including, but not limited to, any information pertaining and/or relating to Schwab's customers and Prospective Customers, and all originals, copies and derivations of Schwab's documents, electronic and telephonic equipment, credit cards, security badges, and passwords. I agree that any Confidential Information stored, recorded or contained on my personal cell phone or any other personal electronic device will be immediately removed or deleted by me upon termination of my employment for any reason. I further agree that I will permit Schwab to inspect any materials provided by Schwab to me or developed by me as a result of or in connection with my employment with Schwab when I accept other employment or otherwise separate from my employment, regardless of where said materials are located.

10. I further agree that for a period of eighteen (18) months after my employment with Schwab ceases beginning on the date of my termination (the "Proscribed Period"), I will not, directly or indirectly, or on behalf of any third party: (a) solicit or attempt to solicit any existing customers I serviced, directly or indirectly, and/or any Prospective Customers (with the exception of individuals or entities listed in the attached Exhibit B), or customers whose identities I learned as a result of my employment with Schwab, in an attempt to divert, transfer or otherwise take away business or prospective business from Schwab; (b) sell or offer to sell any security, retirement, insurance or annuity product or related

service to any customer or Prospective Customer of Schwab that I solicited or attempted to solicit in breach of my obligations hereunder; or (c) solicit or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab. I further agree that the purpose of this provision is to prevent the intentional or inadvertent unlawful use of Schwab's Confidential Information, including its trade secrets. If Schwab assigns me to service specific retail client account relationships (the "Specified Accounts"), I will not, for a period of one year following the termination of my employment with Schwab, initiate any contact for any purpose with any of the Specified Accounts (including notifying them of my new or subsequent place(s) of employment). This restriction will not apply to Schwab clients that I have identified in Exhibit B. I agree that I am being assigned to service the Specified Accounts on a non-exclusive basis, and that Schwab may reassign me to service other client accounts and/or assign other Schwab employees to service the Specified Accounts at any time and at Schwab's sole discretion. Nothing in this Paragraph 9 is intended to prevent me from discussing possible employment or prospective business with any customer, Prospective Customer, employee, consultant or independent contractor who contacts me directly on his or her own volition without my contact, solicitation or attempted solicitation of him or her. I understand that nothing in this Paragraph 9 limits my absolute obligation under Paragraph 4 to never use Confidential Information for any other purpose at any time after my employment with Schwab ceases.

11. I represent and warrant that I do not have any agreement(s) with any former employer or other third party that would be breached by my performance of my duties at Schwab or that would limit, impair or otherwise adversely affect my performance of such duties, and that I will not take any action to breach any such agreement while I am employed by Schwab. In any event, I will not use or disclose to Schwab any confidential information that belongs to others. I have listed on Exhibit C to this Agreement all the confidential, proprietary, trade secret, non-solicitation and/or non-competition agreements to which I am subject and affirm that those agreements, if any, would not be breached by performance of my duties at Schwab. I also agree that I will disclose my obligations under this Agreement to any prospective or future employer or contractor and that my obligations under this Agreement in their entirety shall survive the termination of my employment with Schwab regardless of the reason for the termination.

12. I understand and agree that any breach of this Agreement may subject me to disciplinary action, up to and including termination of my employment (if I am still employed at Schwab). I also understand and agree that any breach of this Agreement by me will cause immediate irreparable injury to Schwab that cannot be adequately compensated by money damages or whose damages may be difficult to ascertain. If a court of competent jurisdiction or an arbitration panel finds that injunctive relief is appropriate to enforce any provision of this Agreement, I agree that Schwab is entitled to such injunctive relief, in order to,

Confidential Information existing in any form from Schwab's premises, except as required in the ordinary course of my duties at Schwab and as necessary for me to perform my duties. I agree that I will promptly return to Schwab immediately upon Schwab's request, my acceptance of other employment, or the termination of my employment for any reason, any and all documents and materials that contain, refer to, or relate in any way to any Confidential Information, as well as any other property of Schwab in my possession or control, including, but not limited to, any information pertaining and/or relating to Schwab's customers and Prospective Customers, and all originals, copies and derivations of Schwab's documents, electronic and telephonic equipment, credit cards, security badges, and passwords. I agree that any Confidential Information stored, recorded or contained on my personal cell phone or any other personal electronic device will be immediately removed or deleted by me upon termination of my employment for any reason. I further agree that I will permit Schwab to inspect any materials provided by Schwab to me or developed by me as a result of or in connection with my employment with Schwab when I accept other employment or otherwise separate from my employment, regardless of where said materials are located.

9. I further agree that for a period of eighteen (18) months after my employment with Schwab ceases beginning on the date of my termination (the "Proscribed Period"), I will not, directly or indirectly, or on behalf of any third party: (a) solicit or attempt to solicit any existing customers I serviced, directly or indirectly, and/or any Prospective Customers (with the exception of individuals or entities listed in the attached Exhibit B), or customers whose identities I learned as a result of my employment with Schwab, in an attempt to divert, transfer or otherwise take away business or prospective business from Schwab; or (b) solicit or attempt to solicit or induce (which shall include, but is not limited to, contact or communication in any manner for the purpose of soliciting or inducing) any employee, vendor or independent contractor of, or consultant to, Schwab to leave his or her employment or assignment with Schwab. I further agree that the purpose of this provision is to prevent the intentional or inadvertent unlawful use of Schwab's Confidential Information, including its trade secrets. If Schwab assigns me to service specific retail client account relationships (the "Specified Accounts"), I will not, for a period of one year following the termination of my employment with Schwab, initiate any contact for any purpose with any of the Specified Accounts (including notifying them of my new or subsequent place(s) of employment). This restriction will not apply to Schwab clients that I have identified in Exhibit B. I agree that I am being assigned to service the Specified Accounts on a non-exclusive basis, and that Schwab may reassign me to service other client accounts and/or assign other Schwab employees to service the Specified Accounts at any time and at Schwab's sole discretion. Nothing in this Paragraph 9 is intended to prevent me from discussing possible employment or prospective business with any customer, Prospective Customer, employee, consultant or independent contractor who contacts me directly on his or her own volition without my contact, solicitation or attempted solicitation of him or her. I understand that nothing in this Paragraph 9 limits my absolute obligation under

acknowledge that Confidential Information and Intellectual Property is the exclusive property of Schwab, its business partners, licensors, and/or clients, and I agree not to assert any claim to it. Except as permitted in Paragraph 7, I agree not to use or disclose any Confidential Information and/or Intellectual Property during or after my employment with Schwab.

2. **What is Schwab Confidential Information and Intellectual Property?**
"Confidential Information" is all information learned during my employment that is not generally known to the public at the time it is made known to me. It includes, but is not limited to: "Trade Secrets" and "Developments," as defined below; names, addresses, phone numbers, email addresses, account numbers or financial information pertaining to Schwab clients or prospective clients; proprietary software designs and hardware configurations; proprietary technology; business methods or strategies; new product and service ideas; marketing, financial, research and sales data; information sufficient to identify clients, vendors, or personnel; client, vendor or personnel lists, contact, account and related information; and all information Schwab treats or is obligated to treat as confidential, privileged, or for internal use only, whether or not owned by Schwab. "Trade Secrets" is any information that (i) has economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its use; and (ii) Schwab takes reasonable steps to protect as secret. "Intellectual Property" is Schwab's copyrighted materials, trademarks, service marks, logos, patents, Trade Secrets, and other intellectual property and proprietary rights.

3. **Agreement Not to Solicit.** While I work for Schwab and for 18 months after my employment ends, I will not directly or indirectly solicit or induce: (a) any existing or prospective Schwab clients I serviced or about whom I gained Confidential Information (other than those listed in Exhibit A) in an attempt to divert, transfer, or otherwise take away business or prospective business from Schwab; and/or (b) any Schwab employee or contingent worker to leave his or her employment or engagement with Schwab.

4. **Removal and Return of Schwab Property.** I will not remove any Schwab property, including any Confidential Information and/or Intellectual Property, in original or copied form, in either electronic or hardcopy form, except as required for me to carry out my job duties while employed by Schwab. Upon termination of my employment with Schwab for any reason, my acceptance of other employment, or at Schwab's request, I will immediately return to Schwab all Schwab property and documents, including but not limited to Confidential Information and/or Intellectual Property; any Schwab-issued credit cards, security badges, keys and Secure ID tokens; and all Schwab-issued electronic and telephonic equipment including but not limited to computers, mobile phones, personal data assistants, CD-ROMs, DVDs, floppy disks, Zip drives, USB storage devices, flash drives, memory cards, or other electronic devices ("Electronic Devices").